ROWAN COUNTY, Kentucky; Don Hall, Individually and in His Capacity as Rowan County Jailer; and Paul Henderson, Individually and in his Capacity as Rowan County Deputy Jailer, Appellants,

v.

William SLOAS, Appellee.

No. 2003–SC–000938–DG.

Supreme Court of Kentucky.

Sept. 21, 2006.

As Corrected Sept. 26, 2006.

Frank H. McCartney, Suit, McCartney & Price, Flemingsburg, William Warner Roberts, Roberts & Watkins, Morehead, Counsel for Appellants.

Robert W. Miller, Robecca K. Phillips, Grayson, Counsel for Appellee.

SCOTT, Justice.

The Appellee, William Sloas (Sloas), was incarcerated in the Rowan County Jail in December 1997 after being convicted of a fourth offense of operating a motor vehicle while under the influence of alcohol, KRS 189A.010, and possession of a controlled substance in the first degree, KRS 218A.1415, both Class D felonies. He was released four months later on April 28, 1998.

At the time, Rowan County operated a jail work program, commonly referred to as the "Class D Work Program," under which state prisoners could volunteer to work on certain county projects under the supervision of the county jail. Pursuant to KRS 532.100(4), Class D (and now Class C) felons may serve out their sentences in a county jail.

According to the Appellant, Don Hall, the Rowan County Jailer (Jailer), the work program was already in place when he was elected in 1994. It later evolved into being called the "Class D Work Program." The program generally consists of six state prisoners under the supervision of a deputy jailer. They work on various county projects, generally at the request of a county department head, such as solid waste, or the road department. At times, however, they are assigned other jobs at the request of the County Judge/Executive and/or various Magistrates. Ninety-percent of the time, however, they work cleaning up trash beside the roadways for the

solid waste department. In return for their work, each state prisoner is paid $1.25 per day by the Commonwealth of Kentucky. And other than minor incidents, no one had ever been hurt on the program, that is, until January 21, 1998.

Sloas volunteered for the program around January 1, 1998. On January 21, he and five (5) other state prisoners were working clearing brush and trees on a roadside clearing project for the county road department at the request of Magistrate Nick Caudill. They were supervised by deputy jailer, Paul Henderson (Henderson), who normally supervises the program. Henderson had been a deputy jailer since 1990 and had been in charge of the work program since 1995. "Hoss" Johnson, with the county road department, was also helping. He brought a truck and a chipper with which to "chip up" the brush and trees they cut.

Sloas was hit that afternoon by a falling tree, cut down by another inmate. At the time, he was standing on the road next to the chipper, figuring, as he said, "it was the safest place" to be. However, Carl Lewis, who cut the tree, said he visually cleared the area before he started cutting, then when he looked up just as he finished the last cut, he saw Sloas standing there, trying to light a cigarette. Henderson said, "it looked like he reached in his pocket to get a cigarette out and then he didn't have it lit and he just walked over like he was asking that boy [John Paul] for a light. Then they all hollered and I hollered too. About that time the tree came down." Sloas' leg was broken below the knee. Appropriate treatment was rendered and all his medical bills were paid by Rowan County. He was last seen by the doctor on April 21, 1998, and was released from jail on April 28, 1998.

Sloas then sued Rowan County, along with the Jailer and Henderson, alleging negligent supervision and training of staff and prisoners without implementation of adequate safety procedures. The Jailer and Henderson were sued in both their official and individual capacities. The claims also included vicarious liability for the negligence of Henderson and state inmate, Carl Lewis.

Following limited discovery, the Rowan Circuit Court granted summary judgment on all claims: for Rowan County on grounds of sovereign immunity; for the Jailer and Henderson in their official capacities on grounds of absolute official immunity; and, for the Jailer and Henderson in their individual capacities, on grounds of qualified official immunity. On appeal, the Court of Appeals affirmed the summary judgments in favor of Rowan County and in favor of the Jailer and Henderson in their official capacities, *see Schwindel v. Meade County*, 113 S.W.3d 159, 163, 169 (Ky.2003), but reversed the summary judgments as to the Jailer and Henderson in their individual capacities, reasoning that "there are genuine issues of material fact with regard to whether Sloas' statutory rights were violated in a manner that would tend to show 'bad faith' on the part of Hall and Henderson." *Sloas v. Rowan County, Ky., et al.*, No.2000–CA–0000560–MR, slip op. at 10, 2003 WL 22149322 (Ky.App. Sept. 19, 2003).

We granted discretionary review and now affirm the Court of Appeals decision regarding Rowan County, as well as the Jailer and Henderson in their official capacities, but reverse their decision against the Jailer and Henderson in their individual capacity as there were no material issues of fact regarding "bad faith," and thus, they were entitled to qualified official

immunity.[1]

## I. *SUMMARY JUDGMENT*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, stipulations and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03.

However, we have also said that summary judgment is only proper "where the movant shows that the adverse party could not prevail under any circumstances." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky.1991). Yet, we have recognized that "a party opposing a properly supported summary judgment motion cannot defeat that motion without presenting at least some affirmative evidence demonstrating that there is a genuine issue of material fact requiring trial." *Hubble v. Johnson*, 841 S.W.2d 169, 171 (Ky.1992). If so, the trial court must then view the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest*, 807 S.W.2d at 480 (citing *Dossett v. New York Mining and Manufacturing Co.*, 451 S.W.2d 843 (Ky.1970)).

Summary judgments play an especially important role when dealing with immunities, as we also view qualified official Im-

munity as an immunity from suit, that is, from the burdens of defending the action, not merely just an immunity from liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *see also Saucier v. Katz*, 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *cf. Lexington–Fayette Urban County Government v. Smolcic*, 142 S.W.3d 128, 135 (Ky. 2004). In the attainment of this goal, however, we differ from the federal standards in one significant aspect.

In *Harlow v. Fitzgerald*, 457 U.S. 800, 816–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the United States Supreme Court rejected the subjective, or "good faith" test for immunity, in favor of an "objective reasonableness standard" designed to avoid the many subjective factual issues so as to permit the early resolution of as many qualified immunity issues as possible prior to trial, typically by summary judgment. *Id.* at 818, 102 S.Ct. 2727. "[S]ubjective intent [or good faith, is a factual question that] so rarely can be decided by summary judgment ... [and] may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues, [and normally requires a trial to resolve]," *id.* at 816–17, 102 S.Ct. 2727, not to mention the social costs attendant to protracted litigation.[2] We, however, still maintain the subjective element of good faith in our jurisprudence.[3]

---

**1.** None of the briefs of the parties addressed the issues regarding Rowan County, the Jailer and Henderson in their official capacities, thus we will not address them either; other than to state that we affirm those portions of the Court of Appeals Opinion.

**2.** "These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will 'dampen the ardor of all but the

most resolute, or the most irresponsible [pubic officials], in the unflinching discharge of their duties.'" *Crawford–El v. Britton*, 523 U.S. 574, 591 n. 12, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (citation omitted).

**3.** *Yanero* did, however, adopt the "objective unreasonableness" test of *Harlow* in consideration of issues of "bad faith" arising solely from the fact of a violation. *Yanero*, 65 S.W.3d at 523.

■ "*Yanero* holds that an official sued in his or her individual capacity 'enjoy[s] only qualified official immunity, which affords protection … for good faith judgment calls made in a legally uncertain environment.'" *Jefferson County Fiscal Court v. Peerce*, 132 S.W.3d 824, 833 (Ky. 2004) (quoting *Yanero v. Davis*, 65 S.W.3d 510 (Ky.2001)). Thus, "[o]fficials are not liable for bad guesses in gray areas," *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir.1992), *cert. denied*, 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993), and "[m]ost government officials are not expected to engage in 'the kind of legal scholarship normally associated with law professors and academicians.'" 1A Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 9A.09[B] (4th ed.2006) (citation omitted). Thus, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

"Once the officer or employee has shown *prima-facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky.2001). "Good faith," however, is somewhat of a misnomer, as the proof is really of "bad faith." In fact, in most cases, "good faith" is just a presumption that exists absent evidence of "bad faith."

> [B]ad faith can be predicated on a violation of a [causally related] constitutional, statutory, or other clearly established right which a person in a public employee's position presumptively would have known was afforded to a person in the plaintiff's position … or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive.

*Yanero*, 65 S.W.3d at 523.

Thus, under our jurisprudence, "good faith" is still at times fact dependant.[4] "[T]he difficulty … with qualified immunity [however,] has not been articulation of the rule, but rather the application of it." *Flatford v. City of Monroe*, 17 F.3d 162, 166 (6th Cir.1994). This difficulty and uncertainty of application may someday presage the need for a "bright line," but not today.

Ultimately, however, once the material facts are resolved, whether a particular defendant is protected by official immunity is a question of law, *Jefferson County Fiscal Court v. Peerce*, 132 S.W.3d 824, 825 (Ky.2004), which we review *de novo. Estate of Clark ex rel. Mitchell v. Daviess County*, 105 S.W.3d 841, 844 (Ky.App. 2003).

## II. THE YANERO TEST FOR QUALIFIED OFFICIAL IMMUNITY

■ Under *Yanero*, public officers and employees are entitled to "qualified official immunity" for negligent conduct when the negligent act or omissions were (1) discretionary acts or functions, that (2) were made in good faith (*i.e.* were not made in "bad faith"), and (3) were within the scope of the employee's authority. *Yanero*, 65 S.W.3d at 522. Conversely, no immunity is afforded for the negligent performance or omissions of a ministerial act, or if the officer or employee willfully or maliciously intended to harm the plaintiff

---

4. Thus, the trial court here property waited on the necessary limited discovery before making its final ruling on the question.

or acted with a corrupt motive, *i.e.,* again the "bad faith" element. *Id.* at 523. And "[o]nce the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act [was in bad faith]." *Id.*

■ In all instances, however, there must be a causally related "violation of a constitutional, statutory, or other clearly established right" of the complainant. *Id.* It is these causally related violations or acts which are measured against the standards of discretionary or ministerial duties, not the distant myriad acts or omissions that one could logically construct to have preceded them. "[I]f one retreats far enough from a . . . violation[, a distant act or omission] can be identified behind almost any such harm inflicted . . . . At the very least there must be an affirmative link between [the act or omission] and the . . . violation alleged." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791(1985).

### III. *THE CLAIMS*

In order to determine the right(s) allegedly violated, we look to the Appellee's complaint, depositions, memorandums, briefs, as well as previous opinions. From this it is apparent, *Sloas alleges that the* Jailer had a "duty to exercise reasonable care to ensure that harm does not occur to an inmate" and "to ensure that his deputy jailers are adequately trained, managed, and supervised." Further, that "jailer Hall *ratified* the negligence of . . . Henderson who, by not providing supervision of inmates when they were in possession of power tools which could readily be used in such a fashion to harm other inmates, by not training the inmates or demonstrating to the inmates the proper meth-

ods for using said tools before distributing them, *by not showing the inmates how to stay out of the way of other inmates falling trees,* and by returning to the same course of conduct in the afternoon instead of taking the precautionary measures alleged as necessary after the injury and the accidents of the morning. The accidents referred to 'in the morning,' were (1) one tree knocked down a neighbor's mailbox, (2) Sloas, 'nicked' his leg (on a barbwire fence), and (3) one of the other inmates, Billy Blackford, had a chainsaw kick back on him, cutting his leg. He further alleges that both Hall and Henderson demonstrated personal wrong doing by failing to adequately supervise the inmates." Vicarious liability is also alleged.

■ As to the allegations of vicarious liability, persons entitled to official immunity cannot be held vicariously liable for the negligence of those employed by them, if they've employed persons of suitable skill. *Yanero,* 65 S.W.3d at 528; *Moores v. Fayette County,* 418 S.W.2d 412, 414 (Ky.1967). We explained this rationale in *Williams v. Kentucky Department of Education,* 113 S.W.3d 145 (Ky.2003):

> The "no vicarious liability" principle recognizes that an otherwise immune entity does not lose that status merely because [his] agents or servants can be held liable for the negligent performance of their ministerial duties. Otherwise, there could be no governmental immunity because state agencies perform their governmental functions by and through their agents, servants and employees.

*Id.* at 154.

■ In this instance, there is no evidence that Henderson lacked suitable skill when he was employed. He had been a deputy jailer for almost nine years as of the time of this incident (before the Jailer was ever elected) and had supervised the

"Class D Work Program" since 1995. Moreover, this was not the first time that the work program had cut brush beside the highways, and there had never been an injury like this before. Although there is authority that a public officer can be subject to personal liability in tort for hiring an employee known to that officer to be incompetent for the task for which hired, evaluating the credentials of a prospective employee is an inherently subjective process and thus a discretionary function. *Yanero,* 65 S.W.3d at 528. That being said, there can be no vicarious liability which pierces immunity, if immunity is found to be applicable. If not, then, of course, vicarious liability could be a consideration. But this aside, the Jailer did not hire Henderson, his predecessor did.

Thus, we are left with individual claims against the Jailer and Henderson of negligent supervision and/or insufficient or improper training of staff and state prisoners, as well as, one further potential claim raised by the Court of Appeals—the rights of an inmate not to be assigned "to unduly hazardous work that would endanger the life or health of the prisoner or others." KRS 441.125(3).

Having in mind the claims, we can more appropriately evaluate the alleged conduct both causally and as to its discretionary or ministerial nature.

## IV. *DISCRETIONARY OR MINISTERIAL*

■ Discretionary acts or functions are "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment...." *Yanero,* 65 S.W.3d at 522. We have also said that discretionary duties are those

as necessarily require the exercise of reason in the adaptation of a means to an end, and discretion in determining how or whether the act shall be done or the course pursued. Discretion in the manner of the performance of an act arises when the act may be performed in one of two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed.

*Collins v. Commonwealth of Ky. Natural Resources and Environmental Protection Cabinet,* 10 S.W.3d 122, 125 (Ky.1999) (quoting *Franklin County, Ky. v. Malone,* 957 S.W.2d 195, 201 (Ky.1997), reversed on other grounds by *Yanero v. Davis,* 65 S.W.3d 510 (Ky.2001)).

Further examples of discretionary acts are *Minger v. Green,* 239 F.3d 793 (6th Cir.2001) (holding that the implementation of a security system by director of public safety at a state university was a discretionary function); *Hall v. United States,* 704 F.2d 246 (6th Cir.1983) (holding that the determination of jeopardy is within the discretion of the acting IRS District Director); *Burnette v. Gee,* 137 Fed.Appx. 806 (6th Cir.2005) (finding that the investigation of a man's attempted suicide and his seizure was a discretionary rather than ministerial act); *Stratton v. Commonwealth,* 182 S.W.3d 516 (Ky.2006) (holding that Cabinet's actions subsequent to its initial investigation into allegations that child was abused were discretionary); *Lamb v. Holmes,* 162 S.W.3d 902 (Ky.2005) (finding that the actions of teachers/administrators in searching students were discretionary in nature); *Jefferson County Fiscal Court v. Peerce,* 132 S.W.3d 824 (Ky.2004) (holding that county judge/executive's decision to terminate former county corrections department officer was discretionary); *Greenway Enterprises, Inc. v. City of Frankfort,* 148 S.W.3d 298 (Ky. App.2004) (holding that the City Manager and Sewer Director, in advising the City to deny hookups until the current system was

repaired, was a discretionary function); *Estate of Clark ex rel. Mitchell v. Daviess County*, 105 S.W.3d 841 (Ky.App.2003) (holding that the decision of the Daviess County Fiscal Court, the engineers, and road foreman with respect to whether and how a portion of a certain road was guarded using guardrails and warning signs was a discretionary function); *James v. Wilson*, 95 S.W.3d 875 (Ky.App.2002) (holding that the enactment of safety rules is a discretionary function for which school employees could not be held liable); *Thompson v. Huecker*, 559 S.W.2d 488 (Ky.App. 1977) (holding that the re-employment of the plaintiff was a discretionary function).

■ A ministerial act, on the other hand, is "one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts. 'That a necessity may exist for the ascertainment of … facts does not operate to convert the act into one discretionary in nature.'" *Yanero*, 65 S.W.3d at 522 (internal citation deleted).

For example, in *Collins v. Commonwealth of Ky. Natural Resources and Environmental Protection Cabinet*, 10 S.W.3d 122, 126 (Ky.1999), the court noted "[t]he regulations specifically required that water control structures for the roads be designed with a discharge capacity capable of passing the peak runoff from a 10–year, 24–hour precipitation event." "The majority in *Collins* held inspecting drainage culverts to assure they conform to the regulations does not require any 'significant judgment, statutory interpretation, or policy-making decisions' and the regulations could be enforced in a 'routine, ministerial manner.'" *Stratton v. Commonwealth*, 182 S.W.3d 516, 520 (Ky.2006) (quoting *Collins*, 10 S.W.3d at 126).

■ And in *Stratton, supra*, we noted that the portions of the investigative responsibilities as set out in regulations, which *were particular in their directive*, were ministerial, but we noted that others, which required the exercise of judgment, were not. "Such investigations do have certain mandated statutory requirements as to who shall be interviewed, etc., but [after this] they also involve discretionary decisions by the case workers, just as in police investigations. After performing their ministerial duties, the case workers must determine what action, if any, should be taken to resolve each claim …." *Id.* at 521. The first part was ministerial, but what followed was held to be discretionary. Furthermore, rule-making is an inherently discretionary function. *Yanero*, 65 S.W.3d at 529. Yet, we have held that enforcement of a well known rule for safety is ministerial, *i.e.*, the "batting helmet" rule in *Yanero*. *Id.* at 529. And, as we have said:

> [e]valuating the credentials of a prospective employee is an inherently subjective process which, of course, is the essence of a discretionary function. However, there is also a ministerial aspect to the hiring process in that the person or persons to whom the hiring of subordinates is entrusted must at least attempt to hire someone who is not incompetent. *Id.* at 528.

Further examples of ministerial acts are *Roberts v. U.S. ex rel. Valentine*, 176 U.S. 221, 20 S.Ct. 376, 44 L.Ed. 443 (1900) (holding that the duty of the treasurer of the United States to pay interest pursuant to the act of Congress, was a ministerial duty); *Morrison v. Lipscomb*, 877 F.2d 463 ( 6th Cir.1989) (holding that a clerk implementing an order at direction of the judge was a ministerial act); *Barnes v. Dorsey*, 480 F.2d 1057 ( 8th Cir.1973) (acts performed by a court clerk are ministeri-

al); *Jones v. Lathram*, 150 S.W.3d 50, 53 (Ky.2004) ("act of safely driving a police cruiser, even in an emergency, is not an act that typically requires any deliberation"—thus it is ministerial); *Williams v. Kentucky Dept. of Educ.*, 113 S.W.3d 145 ( Ky.2003) (compliance with Board of Education Code of Conduct was a ministerial duty); *Kea–Ham Contracting, Inc. v. Floyd County Development Authority*, 37 S.W.3d 703 ( Ky.2000) (erroneous conveyance of information by chairman of county development agency that interim financing for project had been obtained was ministerial error); *Upchurch v. Clinton County*, 330 S.W.2d 428 ( Ky.1959) (employing a dog warden and establishing a dog pound were ministerial duties); *Bronaugh v. Murray*, 294 Ky. 715, 172 S.W.2d 591 (Ky. 1943) (duty of school board to require school bus operators to carry liability insurance was ministerial).

■ As Justice Cooper noted in *Yanero*, "[t]eachers assigned to supervise juveniles during school-sponsored curricular or extracurricular activities have a duty to exercise that degree of care that ordinarily prudent teachers or coaches engaged in the supervision of students … would exercise under similar circumstances." *Yanero*, 65 S.W.3d at 529. The premise for this duty is that a child is compelled to attend to school. *Id.* Admittedly, a more stringent compulsion applies to the incarceration of prisoners as the jailer has custody, rule and charge of the jail and all persons therein pursuant to KRS 71.020. And, "[t]he law imposes the duty on a jailer to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody, but he cannot be charged with negligence in failing to prevent what he could not reasonably anticipate." *Lamb v. Clark*, 282 Ky. 167, 138 S.W.2d 350, 352 (1940.); *see also*, KRS 71.040 (stating that "[he]

shall treat them humanely"). Here, however, the similarity ends, as managing children *"ain't nuthin"* ' like managing prisoners.

■ "Ultimate liability, [then], depends upon the particular circumstances of each case." *Sudderth v. White*, 621 S.W.2d 33, 35 (Ky.App.1981); *see also Franklin County, Ky. v. Malone*, 957 S.W.2d 195, 200 (1998), *reversed on other grounds* by *Yanero v. Davis*, 65 S.W.3d 510 (Ky.2001). And, "a single tragic incident involving jail personnel is not sufficient to establish a claim of inadequate training," *Franklin County, Ky.*, 957 S.W.2d at 200 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)), and "[t]he duty of ordinary care to prevent [harm] arises only upon the discovery of some fact which would lead a reasonable person to believe there is some likelihood of … injury." *Franklin County, Ky.*, 957 S.W.2d at 200.

■ In all societies, there is a line, or a "seam," between appropriate conduct and inappropriate conduct. Sometimes it is a broad line, sometimes thin. This line, or "seam," is defined or established by law. And by our interpretive rulings, this court can more clearly define, or inadvertently obscure, or even move the line, or "seam," characterizing conduct in our society. Thus, we should always realize that every ruling we make, or "seam" we define, obscure, or adjust, has a composite effect, however large or small, on the "efficiency" of the society we live in. In this sense, it is important to note that society has looked (and is looking) for alternative programs in the corrections area with consistent objectives of punishment and rehabilitation in order to lower our incarceration rate. Work programs, as are at issue here, are at the front of these initiations. Having a great stake in the fortunes of tomorrow, we should not be inclined to

fashion rules that unduly hinder, or impede, an honest search for solutions, absent the command of law.

Here, we have a road program that has been operated by Rowan County for many years. It is voluntary, thus no prisoner is forced to do the work for which they are paid $1.25 per day by the Commonwealth of Kentucky. In the prior years of the program, there had never been an injury (other than minor ones), even though brush and trees had been cut on prior occasions. The prisoners generally worked picking up trash, but, from time to time, were given other directions by the County Judge Executive and/or the Magistrates. In this case it was to clear the brush along this road.

Here there were a lot of small bushes, some small trees, and obviously a few bigger trees. The one ultimately involved was 20–30 feet in height, not primeval timber by any means. The brush was on a bank beside and above the road—the road was narrow—but, one side was safe, the other maybe, maybe not. Several people were on the safe side, at least one or more were still cutting brush or trees on the bank. And by his own admission, the plaintiff walks into an area that will soon be "brushed" by a falling tree, yet the plaintiff somehow is unaware of the circumstances going on around—*or for that matter, above him.*

One man, Henderson, a nine year deputy jailer, is in charge of this *crew.* He has to watch them, and try as best he can to anticipate what they might do, correct them as necessary, determine their capabilities, sometimes by asking them forthright whether they can or can't do the job, assign the duties and see that the work is performed. Work somewhat similar to work one would do around his house or farm, in cleaning brush or trees off a bank or out of a field. Work done this day with chainsaws. Chainsaws that you can buy in any hardware store, which many people operate and many of which have had "kickbacks." *One would imagine there are many other things you might think about while managing a work crew of six state prisoners,* but what has been set out is enough. It is as discretionary a task as one could envision. No school children, no college professors or academicians, but state prisoners on a highway with one deputy jailer.

Moreover, even one tree angling sideways after being cut and knocking over a neighbor's mailbox is not a good harbinger of warning that one of your crew is going to amble over by the "chipper" and get hit by a falling tree. There are many reasons a tree could fall the wrong way, yet the evidence would leave us to speculate. And likewise, the "kickback" from a saw blade would not put a reasonable person on notice that one state prisoner is going to walk over to the other side of the road by the "chipper" where a tree would fall on him—of which he will never be aware, cigarette or not. Sometimes things "just happen."

As to the stricture in KRS 441.125(2)(6), that "no prisoner shall be assigned to unduly hazardous work that would endanger the life or health of the prisoner or others," suffice it to say, that everyday people—every day—use chainsaws cutting brush and trees, including prisoners. Dangerous it can be, but "unduly dangerous," it is not.

And too, the training of the staff and state prisoners, under the evidence at hand in this case, was a discretionary act or function. Sloas alleges that possibly Carl Lewis, who cut the tree that fell on him, didn't know how to use a chain saw or cut a tree, but admits that he didn't really know. The evidence from Carl Lewis' de-

position is to the contrary—he had used a chainsaw and cut trees and brush for years. Even Sloas admits that Henderson only assigned a chainsaw to those that told him they knew how to use them, including Sloas—who admits he knew how to use a chainsaw. This makes it all the more astounding that he wasn't paying attention at the time. One could surely wonder how you would ever respond legally to Sloas's allegations that there was a failure in the training program since the inmates were not shown *how to stay out of the way of other inmate's falling trees.* It just goes to show there are some things you just can't train people for. But that doesn't make training, under these circumstances, ministerial. *Ministerial training is where you are mandated to train to avoid the event that occurred.* This was not the case here.

Thus, we conclude that the functions, acts, or omissions for which Hall and Henderson are faulted were in fact discretionary functions.

## V. *THE GOOD FAITH/BAD FAITH ELEMENT*

As was implicit in the discussions in *Yanero,* "good faith" most often exists in the absence of "bad faith," attendant upon proof that the act or function in question was discretionary and in the course and scope of the public official, or employees, public duties. *Yanero,* 65 S.W.3d at 523 ("Characteristically, the Court has defined these elements by identifying the circumstances in which qualified immunity would *not* be available."). "Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Id.* at 523. Thus, the proof re-

quired necessarily focuses on "bad faith," rather than "good faith."

 "[I]f the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive," he acted in "bad faith." *Yanero,* 65 S.W.3d at 523. *See also Cottongim v. Stewart,* 283 Ky. 615, 142 S.W.2d 171, 176 (1940) ("Nevertheless, [they] no doubt with sinister motives in the offing, blindly ignored the law and legal advice...."). Cases are indeed rare where one admits an improper motive.

As is most often the case, the establishment of "bad faith" occurs upon proof of a violation of a "clearly established right" of the plaintiff, which "a person in the public employee's position presumptively would have known was afforded to a person in the defendant's position, *i.e.,* objective unreasonableness ..." *Yanero,* 65 S.W.3d at 523.

For example, in *Spillman v. Beauchamp,* 362 S.W.2d 33, 37 (Ky.1962), it appears employees of the Kentucky Department of Agriculture killed a farmer's cow, over his protests, thinking it was diseased when it may not have been. Allegedly, before it was killed, the circuit court had found it was not diseased and thus, not to be killed. "Of course, if the foregoing allegations are true they will furnish a basis for imposing personal liability upon the officer, because the allegations show a lack of good faith, an absence of reasonable grounds for the officer to believe the cow to be diseased, and the existence of a deliberate flaunting of legal rights." *Id.* at 37.

For a violation of a right to be acceptable as evidence of "bad faith," the rights violated however, must be "clearly established." *See Jefferson County Fiscal Court v. Peerce,* 132 S.W.3d 824, 834 (Ky. 2004) (citing *Yanero,* 65 S.W.3d at 523).

Thus, the factual context of the occurrence must not exemplify a " 'legally uncertain environment' in which qualified official immunity is appropriate." *Peerce,* 132 S.W.3d at 834.

The recognition of a "legally uncertain environment" as established in *Yanero* and explained in *Peerce* is important

> [b]ecause the focus is on whether the officer had fair notice that her [/his] conduct was unlawful, [the] reasonableness [of which] is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's [or employee's] conduct would violate the [law], the officer should not be subject to liability or, indeed, even the burdens of litigation. It is important to emphasis that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

*Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (citations omitted).

In this respect, *Yanero* adopted the "objective reasonableness test" of *Harlow* in consideration of violations as evidence of "bad faith." *Yanero,* 65 S.W.3d at 523. Thus, there is no true subjective test for this element, post *Yanero,* as there is for willful or corrupt motive.

"We make this . . . inquiry in light of the information that the defendant official possessed at the time of the incident in question . . . and cognizant of the fact that public officials generally are not hermetic, ivory-tower scribes versed in the vagaries of constitutional law." *Kegler v. City of Livonia,* 173 F.3d 429, 1999 WL 133110 (6th Cir.1999). Thus, the finding of a "legally uncertain environment," (meaning that the right was not clearly established) not only negates the use of a statutory violation as evidence of "bad faith," it may also be justification for judgment calls

made outside the course and scope of the public official or employee's authority, but within what was believed to be the authority as was implicit in *Peerce, supra,* as discussed later.

Here, in reversing the trial court's summary judgment, the Court of Appeals asserted "there are genuine issues of material fact with regard to whether Sloas' statutory rights [under KRS 441.125] were violated in a manner that would tend to show 'bad faith' on the part of Hall and Henderson, thereby rendering summary judgment improper." *Sloas,* slip op. at 10, 2003 WL 22149322. In support of its decision, the court stated:

> [T]he Legislature has specifically required the jailer to "consider the physical and mental ability of the prisoner" and it has specifically prohibited the jailer from assigning an inmate to "unduly hazardous work that would endanger the life or health of the prisoner or others." Thus, an inmate participating in the [Class D] work program has been given a statutory right not to be assigned to work that is unduly hazardous. This statutory right includes the jailer not subjecting the inmate to endangerment of his life or health by the work of another prisoner. The jailer must also properly consider the physical and mental abilities of all the prisoners who are working in the program and the nature of the work assigned to each prisoner. As *Yanero* makes clear, a violation of one of these statutory rights could lead to a finding of "bad faith" on the part of the jailer, which would preclude the protection of qualified official immunity.

*Id.* at 11, 2003 WL 22149322.

Sloas has [also] alleged that both Hall and Henderson were personally negligent by assigning work to the inmates that they were not qualified to perform

by failing to properly supervise the work area. In addition, Hall stated in his deposition that he had never prepared a written policy concerning [Class D] workers, nor was he aware of any written policy concerning the work program. *Id.* at 12, 2003 WL 22149322.

Moreover, the Court of Appeals also held "summary judgment was erroneously granted with respect to Sloas's claims against Hall and Henderson in their individual capacity, since there remain genuine issues of material fact as to whether Hall and Henderson breached their duty to properly assign the work to the inmates, to supervise the work of the inmates, and to provide a sufficiently safe work area." *Id.* at 13, 2003 WL 22149322.

In support of the opinion of the Court of Appeals, Sloas asserts that the Court of Appeals correctly recognized the following triable issues existed, which precluded summary judgment pursuant to *Yanero:*

1. Material question of fact as to breach of duty to properly assign work to inmates;

2. Material question of fact as to breach of duty to supervise work of inmates;

3. Material question of fact as to breach of duty to provide sufficiently safe work area; and

4. Material question of fact as to whether good faith was used in carrying out discretionary acts.

*Sloas,* slip op. at 13, 2003 WL 22149322.

The Appellee also asserts that Hall and Henderson "disregarded obvious evidence of lack of safety, training and general danger, when they continued with the work detail in question although at least one other inmate had been injured as a result of the tree cutting [Billy Blackford's kickback] . . . [and] another tree had been cut down on a citizen's mall box; all before the injury to the Appellee." *Id.* at 14–15, 2003 WL 22149322.

Yet, in the context of a trial court's view of the material facts in consideration of a motion for summary judgment on the grounds of "qualified official immunity," it is necessary to separate out the material issues of fact which apply only to the plaintiff's claims (should they survive summary judgment), from those that are pertinent to the determination of "qualified official immunity." Thus, issues as to whether Hall and Henderson breached their duty to properly assign the work to the inmates, to supervise the work of the inmates and to provide a sufficiently safe work area, apply only to Sloas's claims—not to the considerations necessary for "qualified official immunity," *unless they are such as to evidence "bad faith."*

"[P]ublic officers and employees enjoy . . . qualified official immunity, which affords *protection from damages liability* for good faith judgment calls made in a legally uncertain environment." *Yanero,* 65 S.W.3d at 522 (emphasis added). If this were not so, then the fact of the wrong *would always obviate the immunity,* as was initially suggested in *Board of Trustees University of Kentucky v. Hayse,* 782 S.W.2d 609, 615 (Ky.1989). And this is the very point upon which we overruled *Hayse. Yanero,* 65 S.W.3d at 521, 523.

Bad faith is "[t]he opposite of 'good faith,' and it is *not prompted by an honest mistake* as to one's rights or duties, but by some interested or sinister motive." *Black's Law Dictionary* 176 (rev. 4th ed.1968) (emphasis added). Thus, if the facts of the violation are not such as to demonstrate or support a finding of "bad faith" on the part of the officer or employee in performing a discretionary function, then the alleged violations of the right involved is irrelevant to "qualified

official immunity" issues. Thus, where the violation of the plaintiff's right is itself one's evidence of "bad faith," the right violated must be clearly established; otherwise, it would not meet the "objective reasonableness" test adopted from *Harlow* by *Yanero*. Thus, in the context of qualified official immunity, "bad faith" can be predicated on a violation of a constitutional, statutory, or other *clearly established right* which a person ... presumptuously would have known was afforded to a person in the plaintiff's position. *Yanero*, 65 S.W.3d at 523 (emphasis added).

A. *Proof of "Bad Faith" Against the Jailer*

 In this case, the only decisions the Jailer made involving Sloas and the other state prisoners were (1) the decision to allow them to participate in the community service work program, (2) allowing Henderson, a nine year deputy, to supervise the work crew, and (3) to let them go back out in the afternoon after Billy Blackford had been brought in, having cut his leg when the saw "kicked back" on him. Each of these decisions was discretionary in that there was no mandate for him to decide them either way. Nor is there any evidence in the record that a "kickback" from a saw, such as occurred here, is anything other than a unexpected occurrence.

Neither is there a showing in the record that the Jailer knew where the specific prisoners were working that day or the specific task assigned each of the prisoners. His primary decision, which was purely discretionary, was to use the work program at all. There is simply no "bad faith" shown by his involvement and actions, as "[t]he power to exercise an honest discretion necessarily includes a power to make an honest mistake of judgment." *Yanero*, 65 S.W.3d at 510.

The Court of Appeals however, implied a factual issue of "bad faith" in that he had not promulgated the written policy specified in KRS 441.125(2), which then provided, in part:

> Pursuant to a written policy *adopted by the fiscal court* on advice of the jailer, the jailer may permit certain prisoners to work on community service related projects.

(Emphasis added).

KRS 441.125(2), it is noted, required the adoption of the written policy by the fiscal court, not the jailer, as he only advised them on the policy. KRS 441.125(2) however, was enacted in 1982, *ten years before* state prisoners were allowed to be kept in county jails for long periods. And, when KRS 532.100 was amended in 1992 to establish the "Class D Program," subsection 6 thereof specifically provided: "Class D felons ... serving their time in a local jail shall be considered state prisoners." Only in 2000 was subsection 2 amended to *require* the jailer *to write* the policy, which, of course, is now submitted to the fiscal court for its approval. This event occurred in 1998.

On the other hand, KRS 532.100(4) *requires an agreement between the fiscal court and the department of corrections in order for the county to house state prisoners.* The record here does not disclose a written policy adopted by the fiscal court pursuant to KRS 441.125(2); nor does it disclose the agreement required between Rowan County and the Kentucky Department of Corrections for Rowan County to keep "Class D" state prisoners. One might assume this agreement would address what the county could or could not do with state prisoners. Nor does the record reflect the Department of Corrections "Policies and Procedures" (CPP) for state prison work programs. Either one or the other exists, or they do not. How-

ever, we note that this was an issue that was not developed in discovery. We also note that Hall testified he relied upon the Department of Corrections' policies in his administration of the work program for the "Class D" prisoners.[5]

Thus, assuming that the agreement between the Rowan County Fiscal Court, the jail, and the Kentucky Department of Corrections do not define the scope of the use of state prisoners in their work programs and/or that the various fiscal court members and all the jailers of Rowan County have failed to adopt an appropriate written policy *since 1982,* the continuation of that failure by all the fiscal courts and jailers since then, including the Appellant's, offers no proof of "bad faith" under these circumstances. "Bad faith" must be directed toward a particular individual, group of individuals, or set of circumstances. Since Sloas was not a prisoner during those intervening years (1982–1997), the failure to adopt such a policy by the previous administrations could not have evidenced their "bad faith" towards Sloas. There must be some implication of self-interest, or a deliberate indifference, or sinister motive, rather than an honest mistake or oversight. Under these circumstances, there were none.

Moreover, 501 KAR 2:060, § 1(4), dealing with procedures for the jail housing of Class D felons, provided in 1998, "[i]f the custody assigned [as determined by the Department of Corrections] is minimum or community, the Class D felon may participate in programs offered outside the jail." Effective 2001, 501 KAR 10:130, § 6(1) (now 501 KAR 7:130, § 5), titled "Prisoner Programs; Services," provides "[s]tate inmates who have an approved custody level shall be allowed to work on community service projects outside the jail if authorized by the jailer." Moreover, the Kentucky Department of Corrections' operations manual for "CD & CC Felons Housed in County Jails" (Rev. March 2005), provides in part, that:

> Level One (1) and Level Two (2) inmates may perform community service work outside the facility under the supervision of trained work supervisors. Level A inmates may perform work outside of the facility under the direct supervision of jail security staff.... Jails have the discretion of choosing which inmates they work, provided that the classification of these inmates is non-discriminatory.

*Operations Manual for CD & CC Felons Housed in County Jails,* Rev. March 2005, Work Programs at 11.

Although it is unknown from the record what was in the 1998 Corrections Operations manual, the Jailer testified he followed the polices provided to him by the Department of Corrections.

At the very least, the foregoing discussion indicates the questions surrounding the interpretation of KRS 441.125(2), as it may or may not apply to state prisoners under the control of the Kentucky Department of Corrections is such as to typify a "legally uncertain environment" in which qualified official immunity is appropriate. *Peerce,* 132 S.W.3d at 834. Thus, the violation may not be used to create or impute "bad faith."

After all, every fiscal court of Rowan county and every jailer thereof was in violation of the written policy requirement, if it applied and assuming there has been no written policy since 1982. All the while, the county Judge/executive, the magis-

---

5. KRS 441.055(1) obligates the Department of Corrections to establish standards for county jails that have state prisoners, including health and safety conditions, custody, care and treatment of prisoners.

trates, as well as the county department heads, were employing and selecting jobs at which the state prisoners would work. Given this prior and public practice, we find no basis to conclude that the Jailer would presumptively have known that he would have violated Sloas's rights by allowing him to voluntarily work on community service projects, absent the written policy, as had all his predecessors since 1982. Thus, this violation, if any, would not support an inference or finding of "bad faith."

Nor would his allowing the prisoners to go back to work after Billy Blackford came in for treatment demonstrate any "bad faith" on his part. As to insufficient training for the staff and prisoners, one must ask—insufficient for what? There is no showing in this record that Henderson was not insufficiently trained to supervise the crew. He had done it successfully for at least three years. Allegations are made he might have been talking to a neighbor during some of the time—but that is not proof of improper training or supervision. And, *how do you train someone to watch out for falling trees* or anticipate they might walk into such areas? This allegation simply does not support an inference of "bad faith."

B. *Deputy Jailer Paul Henderson*

 As to Henderson, the Court of Appeals found material issues of fact as to whether Henderson failed to properly direct or supervise the work crew by either (1) improperly assigning the tasks of cutting the trees, (2) failing to properly supervise them at all times during their work, (3) failing to show them how to stay out of the way of falling trees, (4) failing to provide them a "safe work" place, and/or (5) causing them to engage in "unduly hazardous" work. As answers have already been given regarding "training to avoid falling trees" and "unduly hazardous" work, we

will not duplicate our previous comments. As to providing a "safe work place," there is no evidence that this road, where brush and trees were being cut by state prisoners, was an "unsafe workplace." And we are not disposed to hold so. But, the important point is that none of these issues rise to the level of implying "bad faith" under the circumstances presented.

Brush and trees are cut every day by everyday people. The habits and practices on how to do so safely are common knowledge and obvious to adults. It's just plain common sense that no one has ever found a sure way to teach—especially when it comes to adults avoiding falling trees.

Now, the assignment and operation of chainsaws—under circumstances which did not exist here—could be a closer question. Yet, the record here discloses two important points. Henderson only gave the chainsaw to those he knew (by previous experience with them) could handle them or to those new members such as Sloas, who, when asked, indicated they knew how to handle them. Moreover, the fact that one tree hit a mailbox and that the saw kicked back on Billy Blackford is not an indication that someone is going to walk into an area where trees are being cut without paying strict attention to what is happening. It is an unforeseen and unfortunate incident—but it is not an indication of an improper assignment or supervision of the work area, such as to indicate some "likelihood of the injury," and "bad faith" on the part of Henderson. If an officer "knew or reasonably should have known that the action he took would violate a [clearly established] right of the plaintiff," bad faith may be found to exist. *Yanero*, 65 S.W.3d at 523. Thus, any finding of "bad faith" on Henderson's part, from the facts in this case, would be improper. As to the allegations of improper supervision,

we can find no facts which could support such a finding or belief of "bad faith."

## VI. *SCOPE OF AUTHORITY*

■ In determining the scope of an official's authority, and whether the act complained of was beyond that scope, the issue is not whether the official properly exercised his discretionary duties or whether he violated the law. "If these were the relevant inquiries, any illegal action would, by definition, fall outside the scope of an official's authority." *In re Allen,* 106 F.3d 582, 594 (4th Cir.1997).

We emphasize that public officials seldom use their offices to engage in conduct that is entirely beyond their discretionary authority. In fact, [as here], plaintiffs rarely assert that the defendant officials were not acting pursuant to their job functions and within the scope of authority. This is [simply] because most [section] 1983 claims involve conduct that relates to, or flows from, conduct that the official is indeed authorized to commit. However, when a government official [,or employee], does act totally beyond the scope of his authority, he received no immunity at common law and is entitled to none under § 1983.

*Id.* at 594.

The distinction above is critical in analyzing the scope of authority element in state immunity issues, as "[q]ualified immunity shields an officer [or employee] from suit when [he/she] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he/she] confronted." *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). *See Saucier v. Katz,* 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("[Q]ualified immunity operates to protect the officers from the sometimes 'hazy bor-

der' between excessive and acceptable force."); *see also Kegler v. City of Livonia,* 173 F.3d 429, 1999 WL 133110 (6th Cir. 1999) ("Kegler contends that this court should ... hold that Zoski is collaterally estopped from arguing qualified immunity based upon the Michigan criminal courts finding that the search was illegal. This position, which the district court apparently accepted, is without merit."). Simply put, the alleged wrongfulness of one's act is not determinative of the general scope of one's authority.

■ However, for qualified official immunity to be applicable, the discretionary act must be such that it was made, rightfully or wrongfully, "within the general scope of [the official's] authority." *Franklin County, Kentucky v. Malone,* 957 S.W.2d 195, 201 (Ky.1997), *reversed in part* by *Yanero v. Davis,* 65 S.W.3d 510 (Ky.2001). And "[c]ertainly the jurisdiction of a court to decide a case does not disappear if its decision on the merits is wrong. And we have heretofore rejected the argument that official action is invalid if based on an incorrect decision as to law or fact, if the officer making the decision was empowered to do so." *Wohl Shoe Co. v. Wirtz,* 246 F.Supp. 821, 821–22 (D.C.Mo. 1965) (citing *Adams v. Nagle,* 303 U.S. 532, 542, 58 S.Ct. 687, 692, 82 L.Ed. 999 (1938)).

"The fact that the action ... taken was within the outer perimeter of [an official's] line of duty is enough to render the privilege applicable...." *Barr v. Matteo,* 360 U.S. 564, 575, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

The "outer perimeter" of official's federal employment has traditionally been broadly construed: "The Supreme Court has declared that, with respect to immunity, jurisdiction [of a federal employee to act] ought to be defined broadly to include acts having more or less a connection with the general matters com-

mitted by law to the official's supervision. In other words, an act is within the official's jurisdiction if it is not manifestly or palpably beyond his authority." *Vest v. Waring*, 565 F.Supp. 674, 684 (D.C.Ga.1983) (quoting *Spalding v. Vilas*, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896)). We agree.

■ "The requirement that the acts be within the outer perimeter of the [official's] line of duty is no doubt another way of stating that the act must have more or less [a] connection with the general matters committed by law to the officer's control or supervision, and not be manifestly or palpably beyond his authority." *Norton v. McShane*, 332 F.2d 855, 859 (5th Cir. 1964). "To be within that perimeter, and therefore ... privileged, '[i]t is only necessary that the action bear some reasonable relation to and connection with the duties and responsibilities of the official.'" *Clifton v. Cox*, 549 F.2d 722, 726 (9th Cir.1977) (quoting *Scherer v. Morrow*, 401 F.2d 204, 205 (7th Cir.1968), *cert denied*, 393 U.S. 1084, 89 S.Ct. 868, 21 L.Ed.2d 777 (1969)). *See also Atwater v. Roudebush*, 452 F.Supp. 622, 633 (N.D.Ill.1976) ("[A]ll that is required for immunity is a general connection between the official duties and the alleged wrongful acts.").

Moreover, in *Jefferson County Fiscal Court v. Peerce*, 132 S.W.3d 824, 833–34 (Ky.2004), we acknowledged that the action taken by Judge Armstrong, at the time, was outside the scope of his authority, but we also noted the event occurred within a "legally uncertain environment," as there was no "basis to conclude that Armstrong 'presumptively would have known' that he would exceed his authority...."

In understanding the reach of *Peerce, supra,* it is important to understand the factual basis for the determination of the "legally uncertain environment" found therein. *Peerce* was first presented to this court on a motion for discretionary review from the holding of the Court of Appeals that Jefferson County Judge Executive Armstrong and the fiscal court *had no authority to countermand the merit board's decisions* in regards to hiring. Discretionary review was then denied and thus the decision of the Court of Appeals as to Judge Armstrong's authority became "the law of the case." This was *Peerce* I. Six years later, in *Friedman v. Armstrong*, 59 S.W.3d 875 (Ky.2001), this court addressed the same issue decided by the Court of Appeals six years earlier in *Peerce* I, *but reached the opposite conclusion,* to the effect that the County Judge–Executive and the Jefferson County Fiscal Court *did have the authority* to override the Jefferson County Merit Board. Then, three years after *Friedman, supra, Peerce* came back to this court on another grant of discretionary review from the Court of Appeals (then *Peerce* II), wherein this court was faced with the differing court decisions, made years apart, on the same issue, yet recognized that it was bound by the original decision that the judge did not have the authority by virtue of the "law of the case" doctrine. *See Board of Trustees of the University of Kentucky v. Hayse*, 782 S.W.2d 609, 611 (Ky.1989), *overruled on other grounds* by *Yanero v. Davis*, 65 S.W.3d 510 (Ky.2001).

It was this divergence of opinion on the same question of authority that led to the recognition of the difficulty of the determination of the issue of authority within the context of the case and thus mandated the recognition in *Peerce* II, that "[t]he factual context of this case exemplifies the 'legally uncertain environment' in which qualified official immunity is appropriate. After all, the Court of Appeals reached one conclusion as to the relative authority of the County Judge–Executive ... in *Peerce* I,

in *Friedman v. Armstrong*, this Court examined the same enactments and reached an opposite conclusion." *Peerce*, 132 S.W.3d at 834.

 Here, the fact that the plaintiff was not contesting the issue that the Jailer and Deputy Jailer were acting outside the scope of their authority was pointed out to the trial court weeks before the entry of its December 6, 1999, summary judgment. What the parties were contesting, which is amply illustrated by the Appellee's brief, is whether the Appellant's alleged failure to adopt the written policy regarding work programs as set out in KRS 441.125(2), along with the other difficulties experienced that day on the work program, "clearly illustrate[d] a failure of good faith, thereby precluding a finding of qualified immunity and an entry of summary judgment." This is also the same issue with which the Court of Appeals was primarily concerned. Having already addressed this issue in regard to the question of "bad faith," we feel it necessary to also address it in the context of the Appellant's scope of authority.

The office of a county jailer is recognized by § 99 of the Kentucky Constitution. KRS 71.020 provides that "[e]ach jailer shall have the custody, rule and charge of the jail in his county and of all persons in the jail. . . ." KRS 441.045(1) provides "[t]he county governing body shall prescribe rules for the government, security, safety, and cleanliness of the jail and the comfort and treatment of prisoners, provided such rules are consistent with state law." However, KRS 441.055(1) provides that "[t]he Department of Corrections shall *for those counties which elect to house state prisoners* in their jail: (a)

Adopt the recommendations of the Jail Standards Commission . . . and promulgate regulations . . . establishing minimum standard for jails." The custody, care and treatment of prisoners is one of the required standards. KRS 441.064 mandates the Department of Corrections shall inspect each jail biannually, and shall thereafter notify the jailer and the fiscal court of any deficiencies discovered. For any violations reported, which remain uncorrected, KRS 441.075 grants the commissioner of the Department of Corrections the right to close the jail. KRS 197.110(3), directs the Department of Corrections to promulgate regulations it deems necessary in relation to: "[t]he adequate care, supervision, guarding, discipline, maintenance, transportation, and housing of prisoners when assigned to work outside of the prison." And, for "[a]ny other purposes as the department deems necessary and proper for carrying out the intent of this chapter." KRS 197.110(5). 501 KAR 6:020 (1997), thus established the Department of Corrections Policies and Procedures (CPP) and those adopted by reference, CPP 19.1, dealing with Government Service Projects and 19.2, dealing with Community Service Projects for prisoners.

501 KAR 2:060, § 1(4), provided that, at the time of the incident, "if the custody assigned is minimum or community, a Class D felon may participate in programs offered outside the jail."[6] Custody, for Class D felons is determined by the Department of Corrections. 501 KAR 3:010, § 4(3). Effective in 1982, KRS 441.125(2) allowed a jailer to permit certain prisoners to work on community service related projects pursuant to a written policy adopted by the fiscal court on advice of the jailer.

---

6. This regulation was clarified in 2001 per 501 KAR 10:130, § 6, and now reads, "state prisoners who have an approved custody level shall be allowed to work on community ser- vice projects outside the jail *if authorized by the jailer.*" (Emphasis added). The regulations have now been transferred to 501 KAR 7:130, § 5(1).

Of course, prior to 1992, all felony prisoners, including Class D felons, such as the Appellee, were only held in county jails a short time while awaiting transfer to the Kentucky Department of Corrections. The housing of state Class D prisoners in county jails, rather than in institutions operated by the Department of Corrections, did not begin until 1992 with amendments to KRS 532.100(4)(a), which also requires an agreement to this effect between the Department of Corrections and the appropriate county fiscal court. The amendment to this section in 1992 also provided that "Class D felons ... serving their time in a local jail shall be considered state prisoners." KRS 532.100(6). In fact, when any state Class D felon, housed in the county jail, works under community service related projects, they are paid $1.25 per day by the Kentucky Department of Corrections.

It cannot be doubted that the state has control over state prisoners, except to the extent it may lawfully transfer such control through the implementation of its regulations, correctional polices and procedures and/or agreements required with the housing county. Although cited to, neither the Department of Corrections Policies and Procedures (CPP) or the agreement concerning the housing of the prisoners between the Department of Corrections and Rowan County is available for reasons that the Appellant's authority was uncontested and thus not developed during discovery.

Neither was any discovery taken of the Department of Corrections, by which we could define from the record the distinctions, differing treatment and responsibilities recognized by the Department of Corrections between county prisoners and state prisoners, "Class D felons" or otherwise. Nor was any discovery taken of the Rowan Fiscal Court to establish whether or not any Rowan County Fiscal Court had adopted the written policy dictated by KRS 441.125 on the advice of any jailer since 1982.

The Jailer testified in his deposition that the "work program" was already in place when he took office in 1994. It just evolved into being called the "Class D work program." When asked as to what polices or guidelines he followed he testified, "the state does have certain requirements. I don't know if you'd necessarily call them 'policies' or not—yeah, it would be policy. That would be the only thing, is what the state has furnished." When inquired of as to what the inmates can and can't do in the programs, he pointed out, "it's a set of rules given to us from the Department of Corrections."

The Rowan County "Class D work program" as it is evolved, averages about six state prisoners a day. They work on various county projects, generally at the request of a county department head, such as solid waste, or the road foreman. At times they are assigned special jobs directly at the request of the County Judge–Executive or the magistrates. Ninety-percent of the time, however, they work cleaning up trash beside the roadways for the solid waste department. This course and history of the program is sufficient to establish that the "Class D work program" bears "more or less a connection with the general matters committed by law to the [jailer's] control or supervision, [which are] not ... manifestly or palpably beyond his authority," *Norton*, 332 F.2d at 859, and thus are "within the general scope of [his] authority." *Franklin County*, 957 S.W.2d at 201. Moreover, it typifies the "legally uncertain environment" recognized in *Peerce, supra*, and thus cannot be said to be without his authority.

## VII. CONCLUSION

In that the record established that the acts of the Appellants complained of were performed within the scope of their discretionary authority, and there being no evidence offered from which reasonable jurors could conclude that any of the acts complained of were performed in "bad faith," the Appellant's are entitled to the protection of qualified official immunity. Thus, the opinion of the Court of Appeals is reversed on the questions of Hall and Henderson's entitlement to "qualified official immunity" and the summary judgment of the trial court is reinstated in all respects.

LAMBERT, C.J.; GRAVES, McANULTY and WINTERSHEIMER, JJ., concur.

ROACH, J., concurs in result only.

MINTON, J., dissents by separate opinion.

MINTON, Justice, dissenting.

Because I believe that genuine issues of material fact exist in Sloas's individual capacity claims against Hall and Henderson, I respectfully dissent.

Generally, in order to be entitled to immunity, Hall and Henderson were required to make a prima facie showing that they were acting within the scope of their authority in operating the Class D Work Program.[1] This "scope of authority" inquiry seems to focus primarily upon whether the official had the legal authority to engage in the conduct in question, rather than the propriety of the manner in which that conduct was performed.

At the time of Sloas's injuries, KRS 441.125(2) provided that "[p]ursuant to a written policy adopted by the fiscal court on advice of the jailer, the jailer may permit certain prisoners to work on community service related projects. Before a prisoner is permitted to work in this type project, the county judge/executive or his designee shall sign his approval to the prisoner's participation." Thus, absent a written policy adopted by the fiscal court and absent the written approval of the county judge/executive (or his designee) of each inmate's participation in the program, a jailer was not authorized to operate a community service work program. In his deposition, Hall admitted that he had never prepared a written policy concerning community service work by jail inmates, nor was he aware of any such written policy being effectuated before his taking office in 1994. Similarly, Henderson, who had worked at the jail since 1990, testified that he was unaware of any written policy authorizing the community service work project. Neither Hall nor Henderson testified that the county judge/executive had specifically approved Sloas's participation in the program.

Long ago, we held that a public official who exceeds the limits of his lawful authority "must respond to the party injured like any other wrongdoer."[2] Given the testimony of Hall and Henderson that no written policy had been adopted by the fiscal court authorizing the Class D Work Program; and given their further testimony that they were not aware of the county judge/executive having approved Sloas's participation in that program, it appears to me that, at a minimum, a genuine issue of material fact exists as to whether Hall and

---

1. *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001).

2. *Cottongim v. Stewart*, 283 Ky. 615, 142 S.W.2d 171, 177 (1940) (quoting MECHEN ON PUBLIC OFFICERS, pp. 445, 633, *et seq.*).

Henderson exceeded their statutory authority when they authorized Sloas to participate in the program. Clearly, then, the Court of Appeals correctly reversed the trial court's decision to grant summary judgment to Hall and Henderson in Sloas's individual capacity claims.

By concluding that Hall and Henderson are entitled to summary judgment on Sloas's individual capacity claims against them, despite their possible failure to follow the strictures of KRS 441.125, the majority usurps a jury's role as the finder of fact. That approach, although perhaps superficially appealing under the facts of this case, ignores the summary judgment standard we set forth in *Steelvest, Inc. v. Scansteel Service Center, Inc.*[3] So I respectfully dissent.

---

**3.** 807 S.W.2d 476, 480 (Ky.1991) ("[t]he record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor. Even though a trial court may believe the party opposing the motion may not succeed at trial, it should not render a summary judgment if there is any issue of material fact. The trial judge must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists. It clearly is not the purpose of the summary judgment rule, as we have often declared, to cut litigants off from their right of trial if they have issues to try.").