**Alan OSTER, Appellant**

v.

**Paula OSTER, Appellee.**

**No. 2013–CA–001028–ME.**

Court of Appeals of Kentucky.

July 18, 2014.

Allen McKee Dodd, Jacob W. Crouse, Richard I. Williams, Jr., Louisville, KY, for Appellant.

No brief filed.

Before CLAYTON, COMBS, and NICKELL, Judges.

*OPINION*

NICKELL, Judge:

Alan Oster appeals from an order entered by the Jefferson Family Court reinitiating contact between his two sons and their mother, his former wife, Paula Oster. Upon careful review, we reverse and remand for further proceedings consistent with this Opinion.

As a preliminary matter, neither party is in compliance with CR [1] 76.12. Paula, a non-attorney who represented herself often in the trial court, has chosen not to file an appellate brief.[2] We could view her decision a confession of error and rule in Alan's favor without considering the merits. CR 76.12(8)(c)(iii). However, Kentucky courts have held imposition of this sanction is inappropriate when a child's custody is at stake. *Galloway v. Pruitt,* 469 S.W.2d 556, 557 (Ky.1971); *Borjesson v. Borjesson,* 437 S.W.2d 191, 193 (Ky. 1969). While this is not a custody matter—Paula has asked only that she be allowed to resume contact with her children—we will nonetheless consider the merits.

Alan's brief does not comply with CR 76.12(4)(c)(v) which requires each argument in the appellant's brief to begin with "a statement with reference to the record

---

1.  Kentucky Rules of Civil Procedure.

2.  On June 27, 2014, Paula moved for additional time to file a brief. The motion was denied as untimely.

showing whether the issue was properly preserved for review and, if so, in what manner." Alan has raised four issues but none begins with a statement of preservation. Case law is abundantly clear that we are not obligated to search the record to locate where an issue may have been preserved. *See Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 53 (Ky.2003); *Robbins v. Robbins*, 849 S.W.2d 571, 572 (Ky.App. 1993). Pursuant to CR 73.02(2), when a party fails to comply with the appellate rules, we are authorized to dismiss the appeal, strike pleadings and briefs, impose fines, or craft "further remedies." In light of the seriousness of this appeal, and our own search of the record, we will not impose sanctions but instead caution counsel to adhere to the rules of appellate practice in the future.

This is not the first time Alan and Paula have sought relief in this Court. In fact, this is the sixth case number assigned to these parties since 2009. The litigation was previously chronicled in *Oster v. Oster*, 2012 WL 5457325, Case Nos. 2009–CA–000135–ME and 2009–CA–001444–ME (Ky.App., November 9, 2012, unpublished). Rather than recounting the troubling history of these parties, we emphasize only those facts essential to an understanding of the specific issues at hand.

Alan and Paula married in 1998 and are the biological parents of two boys born in 2000 and 2002. Their divorce became final in March of 2005. On December 19, 2008, the Jefferson Family Court granted Alan sole custody of the boys; permitted Paula only therapeutic visitation with the boys through the boys' therapist; and ordered Paula to pay Alan $60.00 in monthly child support.[3] Paula has not seen the boys since December 2008.

Alan is an orthopedic surgeon. He remarried in April of 2005. He and his new wife, Jade, have three children of their own and live in Louisville, Kentucky, with the two boys from his marriage to Paula. The boys are excelling in all aspects of life. Both have expressed a desire to see their mother.

Paula graduated from medical school in 2004, but never completed her boards. While in college, she suffered a closed head injury that mental health experts believe has culminated in a host of issues including impulsivity; a paranoid preoccupation with the notion that others are against her; and, an inability to respect boundaries, remain calm, control anger and frustration, function independently, and manage mood and behavior. She has been diagnosed with anxiety disorder, NOS; borderline personality disorder; and, obsessive/compulsive disorder. Paula is unemployed and relies on her twin sister for financial support.

On January 4, 2009, Paula copied Alan on an e-mail she sent to her sister about a non-custodial parent who killed his son rather than paying child support. The e-mail triggered entry of a domestic violence order (DVO) against Paula on March 10, 2009. A panel of this Court affirmed the DVO's entry in *Oster*, at *9. On March 20, 2012, the DVO was extended and reissued for another three years.

With that brief history in mind, we focus on the most recent events that led the family court to enter the "Order on Reinitiation of Contact" challenged by Alan in this appeal. On July 20, 2011, an order was entered stating in relevant part:

**3.** As of June 4, 2012, Paula had not paid child support in more than a year. As of February 1, 2013, she still had not made a payment.

## Conclusions of Law

The court believes that it would be in the best interest of the children to have a relationship with their mother if Paula can demonstrate that she no longer poses a threat to the children's well-being. Given the substantial progress the children have made since Paula has been removed from their lives, it is important to re-introduce her in a way that minimizes the risk to the children.

Paula has significant mental health issues and she has failed to use the last few years to accomplish anything of value in her professional life or toward her personal growth.

For Paula to have contact with her children, she must comply with *all* recommendations as set out by Dr. [Kaveh] Zamanian. Dr. Zamanian is appointed to oversee Paula's re-introduction into the boys' lives, and Paula must comply with all directives. She is to have a psychiatric evaluation, and must take any prescribed medications as prescribed. She must continue in treatment with a therapist recommended by Dr. Zamanian. Paula must demonstrate the ability to comply with Dr. Zamanian's instructions and court orders. She must work cooperatively with all treatment providers as recommended by Dr. Zamanian. Failure to cooperate will effectively end efforts to reunify Paula with the boys anytime in the foreseeable future.

It is important that Paula appreciates the opportunity she has to become a part of her children's lives again. Her failure to acknowledge her problems or accept responsibility for her actions has only lengthened the time she has been removed from their lives. She needs to actively concentrate on understanding and improving herself so she can be a positive influence on her boys.

. . .

Paula's failure to comply with court orders, fabrication of allegations, and repeated petitions for legal relief without compliance with previous directives has (sic) greatly increased the costs of this action. Her behavior has also unnecessarily utilized the resources of social services and the police at no cost to her.

All of Paula's financial needs are met by her family. She does not appear to have any incentive to obtain employment as either Alan bears the cost of all expenses relating to her motions or her legal fees are paid by her family.

It is inequitable to allow Paula to remain unemployed—especially if she is so close to obtaining her residency, as she testified. Paula is either significantly mentally ill, and therefore is unable to obtain a position in the medical field and is in need of serious treatment, or she is fully capable of finding some type of employment commensurate with her training. It is also inequitable to require Alan to bear the financial cost of ongoing litigation which is primarily a result of Paula's refusal to adequately address her mental health needs.

. . .

Based on the testimony, applicable statutes, review of the file, and the Court being sufficiently advised, IT IS HEREBY ORDERED that:

1. Paula's contact with the parties' children shall be at the direction of Dr. Zamanian. The parties shall cooperate fully with Dr. Zamanian's recommendations and comply with all treatment providers and their recommendations.

2. Dr. Zamanian will contact the parties within fourteen days of entry of this order to initiate the process.

3. Dr. Zamanian's future costs for directing Paula's re-integration into the children's lives shall be apportioned 70% to Alan and 30% to Paula.

4. Alan is responsible for $5,000 toward Paula's attorney's fees. Paula is responsible for the balance of fees and will be responsible for any future attorney's fees and costs (absent some extraordinary circumstance).

5. Paula is responsible for $562 toward Alan's attorney's fees due to her failure to comply with discovery requests. Counsel for Alan submitted an affidavit regarding fees at the direction of the Court.

6. Counsel may move for common law judgments, if needed.

7. This is a final and appealable order.

(Emphasis in original.) On May 29, 2012, Paula filed a NOTICE–MOTION–ORDER seeking an order to: require child support to be forwarded through a third party; clarify the requirements for visitation and/or reunification; schedule a hearing for immediate visitation; and appoint a parenting reunification facilitator.

On July 25, 2012, the trial court convened a hearing that did not finally conclude until February 1, 2013. Testimony was heard on four separate days. Witnesses were Dr. Zamanian, the court-appointed evaluator; Dr. James Bloch, a psychologist and Paula's treating therapist; Terry Fontenot, the boys' therapist; Paula; and Alan. All the witnesses—including Paula—testified she had not fully complied with Dr. Zamanian's recommendations.

On March 14, 2013, the trial court entered a twelve-page order stating, "[b]y all accounts, Paula has not complied with all of the recommendations of Dr. Zamanian as set out in the July 2011 order." Despite that statement, the court set sail toward reunifying mother and sons. On

the record presented to us, we simply cannot affirm this change in course.

The trial court's 2011 order stated in no uncertain terms, "[f]or Paula to have contact with her children, she must comply with *all* recommendations as set out by Dr. Zamanian." Those recommendations were included in a report dated March 18, 2011, and included five items:

1. For the next four months Ms. Oster must not violate any of the provisions of the custody arrangement and the Domestic Violence Order, and she must refrain from any inappropriate communication. This is in an effort to offer a structure to determine if Ms. Oster is able to organize herself both emotionally and behaviorally to abide by the basic rules of conduct agreed upon and refrain from any inappropriate communication and boundary violation. Any breach of this code of conduct should force a reconsideration of the timeline for visitation. If upon the four-month period Ms. Oster has demonstrated that she is able to maintain emotional and behavioral composure, then a period of supervised visitation with the children could commence.

2. Upon commencement of supervised visitation Dr. Katie McBride is recommended as the person who could facilitate reunification and supervise Ms. Oster's visitation with the children. In the interim, given the level of injury and discord between the parties, it is advisable for Dr. McBride, if she agrees and is available, to serve as a person who could work with Ms. Oster and keep her abreast of the children's medical and emotional health. This is offered as a way of helping Ms. Oster better manage her disparate feeling and begin to focus on her personal and

professional concerns such as passing the board examination and securing employment.

3. Ms. Oster is expected to continue in individual psychotherapy. However, Ms. Oster's current psychological treatment is not adequately addressing the depth and breath (sic) of her problems. Ms. Oster struggles with a long-standing personality pattern that requires a more intensive treatment regimen. In accordance with the clinical picture, it is advised that Ms. Oster attends (sic) individual psychotherapy a minimum of twice a week. In this context both remote and recent past issues are to be examined in an effort to help Ms. Oster improve her self-observing capacity, accountability and judgment, ability to regulate and manage her impulses and ultimately work to improve her adaptive and coping skills. In accordance with Ms. Oster's diagnostic and clinical needs I recommend a clinical psychologist who is experienced in working with cases of complicated divorce, trauma and personality disorders. In this regard, Dr. Jim Bloch may be considered, if he is available. The new psychotherapy regimen should commence immediately and (sic) closely monitored in the next few months to ensure compliance with the treatment protocol. Once Dr. Bloch has had an opportunity to begin treatment with Ms. Oster he could determine if and when Dialectical Group Psychotherapy should commence.

4. Ms. Oster should also consult a psychiatrist for medication consultation and management. Ms. Oster has an extended history of struggling with symptoms of obsessive-compulsive disorder, impulse control and affect regulation. Psychotropic medication is likely to help curve (sic) the intensity of her symptoms and allow her to be more engaged and available for talk-therapy. In this regard, Dr. Sueellen Stevens may be considered, if she is available. The psychiatric consultation should commence immediately and be closely monitored in the next few months to ensure compliance with the treatment protocol.

5. In the next four months, once Ms. Oster has shown compliance with behavioral and treatment agreement, supervised visitation shall commence. In this context Dr. Katie McBride is recommended as a professional who could facilitate the reunification process by working closely with Mr. Oster and Ms. Oster and all other mental health professionals involved. Specifically, Dr. McBride is encouraged to work closely with Mr. Fonteno (sic), the children's therapist, in an effort to manage the reunification process and ensure that the children's needs are considered. It is my hope that by working in collaboration the reunification process causes little disruption in the children's lives.

Importantly, the trial court conditioned reunification on compliance with *"all"* of Dr. Zamanian's recommendations and even underlined the word "all" for extra emphasis. Partial compliance—or even full compliance with some, but not all—of the items recommended was not enough to trigger reinitiation of contact with Paula's children. Until the July 2011 order is set aside, modified or reversed, it is binding on the parties and Paula must obey it. *See Crook v. Schumann*, 292 Ky. 750, 167 S.W.2d 836, 839 (1942) (in context of contempt motion).

Comparing the order to Dr. Zamanian's recommendations and the hearing testimony, it appears Paula's only act of compliance has been refraining from doing anything disruptive.[4] At the hearing on June 4, 2012, Paula told the trial court, "Generally speaking, I've been compliant" with Dr. Zamanian's recommendations. While the list of Paula's strides was very short, the list of what she had not done was extensive, including waiting months before contacting Dr. Zamanian, Dr. Bruce Tasch, and Dr. Bloch—despite a directive that work "should commence immediately[.]" Furthermore, she balked at taking medication, preferring a holistic approach instead. Because Paula had not complied with all of Dr. Zamanian's recommendations—which the trial court had adopted in full—considering reinitiation of contact should have been foreclosed.

■ In its 2013 order, the trial court *presumed* visitation was in the boys' best interests. KRS 403.320(1). We review whether Paula was entitled to that presumption *de novo*. *Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky.2006). We disagree with the trial court's interpretation. A DVO entered against Paula in 2009—and renewed in 2012—prohibited any contact between Paula and Alan or the boys. Several other requests filed by Paula to see her boys were also denied. "In modifying a previous denial of visitation to allow visitation, there is no presumption, as in subsection (1), of entitlement to visitation. Instead, the child's best interests must prevail." *Hornback v. Hornback*, 636 S.W.2d 24, 26 (Ky.App.1982). "When visitation has already been denied, the standard for modification is not serious

endangerment; rather, the best interests of the children governs." *McNeeley v. McNeeley*, 45 S.W.3d 876, 878 (Ky.App. 2001). Thus, the trial court erroneously applied the presumption that a parent is usually entitled to reasonable visitation.

■ We now consider whether there was substantial evidence resuming visitation would be in the boys' best interests. *See Pennington v. Marcum*, 266 S.W.3d 759, 762 (Ky.2008). No witnesses gave a resounding vote of confidence in resuming visitation. Dr. Zamanian had reluctantly recommended supervised visitation, if certain conditions were met. Those conditions were not satisfied and at the hearing on July 25, 2012, he stated he opposed resuming visitation.

In describing his current concerns about Paula, he testified: she has not demonstrated an ability to function independently; she does not have a job; she relies on family for financial support; she needs to take responsibility for her own finances as a show of independence; she has not paid Dr. Zamanian for his services; she has not paid child support for more than a year; she sees Alan as persecuting her and attempting to prevent her from seeing her sons until they turn eighteen; she has not admitted she has borderline personality disorder and has not received treatment for it—the lack of treatment being the main reason he opposes visitation; she told Dr. Tasch she was actively seeing Dr. Bloch when she was not; she told Dr. Tasch she had been diagnosed with only Post Traumatic Stress Disorder; and, she had not addressed her real issues with Dr. Tasch, who was treating her for procrastination, difficulty completing tasks and low

---

4. Alan testified Paula had brought sharp instruments to a visitation with the children at The Family Place so they could carve pumpkins. Upon being told that was not allowed, she hid the instruments on the premises. We realize this was self-serving testimony for Alan, but it vividly demonstrates the concern voiced by a majority of the mental health experts who have viewed the case objectively.

self-esteem. Dr. Zamanian stated he had been exhausted by Paula, whom he described as defensive and paranoid. He pointed out that he is not her treating psychologist, just the person overseeing the case at the court's direction.

Fontenot began treating the boys in March of 2007 and currently sees them about every three weeks. Initially, there were school problems, difficulty with both parents, poor impulse and anger control, and they were both highly defiant. When therapy began, Paula often accompanied the boys. Sometimes she functioned well—other times she did not. Fontenot testified Paula's actions probably frightened the boys.

The boys are currently functioning well and doing excellent school work. After a meeting with Dr. Zamanian in April 2012, the boys regressed—becoming disruptive and defiant with both Alan and Dr. Zamanian. Fontenot attributed the abrupt change in attitude to the possibility of seeing Paula. According to Fontenot, the boys want to see their mother, but the thought of doing so stirs old fears. He testified the boys are not currently mentally and emotionally prepared to have supervised visitation with their mother and strongly opposed reinitiating visitation.

When the trial court commented that it did not seem good to just ignore Paula, especially when both boys had expressed a desire to see her, Fontenot stated he was concerned about reintroducing Paula because the boys had regressed so much just on the thought they might see their mother, that until Paula satisfies Dr. Zamanian's recommendations, therapeutic visitation will be very difficult. He expressed concern that starting and stopping visitation would be devastating, but could not definitively say cessation would cause irreversible, permanent mental, social and emotional damage to the boys. He stated the boys may shoulder a big part of the blame if visitation starts and stops, and that "would compromise them for quite awhile."

Fontenot was deeply concerned that the great improvement made by the boys during the years Paula has been absent from their lives would be quickly erased and the boys would actually regress further. He testified the boys are "very vulnerable" to contact with Paula, and that vulnerability would have been reduced had Paula adhered to Dr. Zamanian's recommendations. He said there was a "significant likelihood" Paula would make inappropriate comments during visitation and any intervention would need to be immediate.

Since she was representing herself at the hearing, Paula asked Fontenot what he wanted her to do to pave the way for resuming visitation. He replied: comply with the treatment recommendations; engage in regular therapy; recognize things that get in the way of your parenting; and, support Alan and Jade—don't see all their actions as mistakes; they have valid explanations for things you disbelieve as a result of your own fears.

The guardian *ad litem* (GAL) had initially endorsed a slow resumption of supervised visitation. However, in a supplemental report submitted August 29, 2012, she pulled back after learning Dr. Bloch was only trying to help Paula increase her self-monitoring and self-regulation, when the list of issues needing attention was much broader. The GAL was less concerned about Paula's diagnosis and whether she was troubled by a long ago head injury, than "whether she is addressing her behaviors that in the past have lead (sic) to her inability to parent her children today." The GAL expressed concern that "Paula still does not seem to fully accept or understand her actions that led to her loss of contact with her children and therefore is

unlikely to bring them up to a therapist herself." The GAL doubted therapy focusing solely on topics raised by Paula would be helpful. The GAL did say, "at some point in the future, when both boys are more mature, there needs to be a plan for some therapeutic contact with their mother regardless of her progress." From the GAL's comments, it is apparent she does not believe the future is now.

A major stumbling block in this case has been Dr. Bloch's disagreement with Dr. Zamanian's assessment of the case. Dr. Zamanian handpicked Dr. Bloch to work with Paula, and Dr. Bloch testified he accepted the case as a favor to Dr. Zamanian. He also said he would never accept another court appointment.

When Dr. Zamanian testified, he described Dr. Bloch as being "happy not to be in the loop," suggesting he was relying more on input from Paula than reports from mental health experts. According to Dr. Zamanian, Dr. Bloch is not a forensic psychologist and does not believe Paula needs twice weekly treatment. His last conversation with Dr. Bloch ended on a "sour note."

When Dr. Bloch testified, Paula was representing herself, and as he pointed out, Paula may have been confused by acting as both client and attorney. Dr. Bloch stated he had received reports from Dr. Zamanian and Dr. Jennifer Cebe, the original custody evaluator, but did not say he had read them or followed them. He stated he did not consider Dr. Zamanian's report to be a directive to him to conduct certain types of therapy twice a week—he does not even perform intensive psychotherapy—but rather that Dr. Zamanian had merely recommended to the court that twice weekly therapy sessions would be beneficial.

Dr. Bloch stated emphatically he is Paula's advocate and made no claim of neutrality. He has never met the boys, has never seen Paula interact with the boys, and has no opinion on Paula's ability to parent adequately. The closest he came to supporting Paula's motion to resume visitation was his statement that he believes supervised visitation is an appropriate next step for Paula, to see how she performs. What is appropriate *for Paula,* however, is not the standard. *The question is not what is in Paula's best interests, but what is in her children's best interests.*

Importantly, Dr. Bloch stated he could not say whether supervised visitation would be in the boys' best interests. If any witness was going to supply proof on Paula's behalf that reinitiating visitation was appropriate, we would have expected it to come from Dr. Bloch—but it did not. Instead, he said he could not predict what might trigger Paula's unstable emotions and behaviors, and did not know whether her mood disorder could make supervised visitation harmful to the boys. Dr. Bloch admitted Paula handled some moments well in therapy, but not all, and he did not have enough data to say supervised visitation should not go forward.

On the final day of testimony, February 1, 2013, Paula was represented by counsel and testified in her own behalf. Paula stated she had been denied jobs because of the DVO and had been volunteering—without pay—at a clinic for one week. She stated she wants to complete her residency and be employed, but she needs to develop confidence. She said she is thinking of going to law school at night. Paula said she has some mental health issues on which she is working.

On cross-examination, Paula said she had not spoken to Dr. Zamanian since May of 2012 and had not seen Dr. Tasch since about March of 2012. Because her ADHD is stabilized with medicine, she does not

expect to see Dr. Tasch again. She acknowledged she did not tell Dr. Tasch about her borderline personality disorder; anxiety disorder, NOS; or obsessive/compulsive disorder. She also agreed she had not complied with Dr. Zamanian's recommendations.

She again confirmed she had not paid child support since May 2011, explaining she had the money in an account, but had paid nothing because she did not want to mail the payments—fearing Alan or his attorney would claim she had not sent the payments. She learned at the hearing her nonpayment of $60.00 a month for two children constituted flagrant non-support, a felony.

At this hearing, the GAL said the boys are older, can handle more, and are becoming angry at not seeing Paula—they do not understand what is taking so long. The GAL's comments could be construed as supportive of visitation, but must be contrasted with her belief that visitation should not begin until all the experts are fairly certain it will work.

Alan was the last witness to testify. He said the boys are doing extremely well in school; both are in advanced classes and involved in sports. By November of 2008—while Paula had supervised visitation—Alan said he had been called to the school twenty-three times; and the younger boy—who was in first grade at the time—had been suspended twice. Alan stated he wants the boys to spend time with Paula but fears it will go awry and asked that supervised visitation be delayed.

Alan also described the aftermath of the boys' brief meeting with Dr. Zamanian where there was talk of maybe seeing their mother. Afterwards there was a major disruption in their behavior that lasted a couple of months. They fought, bruised each other, were rude, and talked back to

Alan; conduct Fontenot witnessed. Alan stated he does not believe the boys are ready to see Paula, fearing they will regress. He has seen no change in Paula's behavior and believes the boys will blame themselves if visitation fails. Alan said he would like to see the experts agree before visitation begins.

At the conclusion of the hearing, the trial court took the matter under submission and issued a twelve-page opinion ordering Dr. Barbara Beauchamp to begin the reunification process. As the basis for its decision, the trial court noted the boys have grown four years older since Paula's contact with them was suspended "due to the detrimental effect her behavior had on her children," and determined attempting reunification—even if it failed—was better than keeping the boys apart from Paula, especially since the boys want to see Paula and Paula "is desperate for contact with her children."

We have set forth the testimony in great detail and have not located substantial evidence that supervised visitation is in the boys' best interests. Since Paula sought the modification, she bore the burden of proving a resumption of supervised visitation was in her children's best interests. *McNeeley*, 45 S.W.3d at 878. She failed. Further, as *Hornback* points out, the prior order specifying the conditions must be complied with when considering modification. It is the law of the case between the parties. *Hornback*, 636 S.W.2d at 25. Normally, we give great deference to a trial court's finding of facts. *Frances v. Frances*, 266 S.W.3d 754, 758–59 (Ky. 2008). Here, we cannot. The record simply does not support the trial court's resolution.

We have watched Paula at numerous hearings and have seen her test the trial court's considerable patience. To be sure,

she is a sympathetic figure. However, numerous seasoned mental health experts have been involved with this case and the overwhelming majority of them have advised against resuming supervised visitation at this time. Most importantly, *none* of them, not even Paula's own self-described "advocate"—Dr. Bloch—said immediate resumption of supervised visitation is in the boys' best interest.

While the boys themselves have expressed a desire to see their mother, a child's wishes are but one factor to consider. KRS 403.270(2). This is a situation where the informed opinion of the collective mental health community must prevail. By ordering visitation to resume, the trial court rewarded Paula for failing to comply with a prior court order and removed any incentive for her to improve so she could see her children. We believe the trial court erroneously applied KRS 403.320(3) because allowing supervised visitation to resume would not be in the children's best interests. Its decision to the contrary was against the great weight of the evidence.

Alan has raised other issues we deem moot in light of our resolution of the appeal. We reverse and remand for further proceedings consistent with this Opinion.

CLAYTON, Judge, Concurs.

COMBS, Judge, Concurs in Result Only.