RENDERED: AUGUST 8, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0778-MR

JEFFERSON COUNTY SHERIFF'S
OFFICE; JEFFERSON COUNTY
SHERIFF'S OFFICE MAJOR
GEORGE GRISSOM, IN HIS
INDIVIDUAL CAPACITY; AND
JEFFERSON COUNTY SHERIFF
JOHN AUBREY, IN HIS
INDIVIDUAL CAPACITY                                    APPELLANTS


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE TRACY E. DAVIS, JUDGE
                    ACTION NO. 20-CI-004224


KEJOHN JENNINGS                                          APPELLEE


OPINION
AFFIRMING IN PART,
VACATING IN PART, AND REMANDING

** ** ** ** **

BEFORE: A. JONES, L. JONES, AND TAYLOR, JUDGES.

JONES, L., JUDGE: Jefferson County Sheriff John Aubrey (Sheriff Aubrey), the

Jefferson County Sheriff's Office (JCSO), and JCSO Major George Grissom

(Grissom) appeal from the June 5, 2024 Opinion and Order of the Jefferson Circuit Court which denied Grissom's claim of qualified official immunity as to the individual capacity claims against him; and denied the JCSO's claim of immunity for the tortious acts of Grissom. Appellants also seek qualified official immunity on behalf of Sheriff Aubrey which the circuit court failed to address.

FACTS AND PROCEDURAL POSTURE

During the summer of 2020, tensions were high and nationwide protests were underway following the tragic deaths of Breonna Taylor, George Floyd, and others at the hands of police. In Louisville, Kentucky, the park where many of these protests occurred was close in proximity to the Jefferson County Hall of Justice (HOJ). On July 10, 2020, at approximately 8:00 p.m., Appellee, KeJohn Jennings, approached a set of chained doors at the HOJ. The doors did not lock, but the chains prevented them from opening wider than a few inches. Grissom was one of several JCSO deputies assigned to court security at the HOJ. It is undisputed that Jennings was audibly and visibly agitated as he stood outside the HOJ at the gap between the chained doors and shouted insults at JCSO Sgt. John Porter (Porter). Both sides agree that Jennings was holding a bag in his hand. According to Grissom's seemingly unrebutted testimony, federal officials had warned of incendiary devices which protestors had concealed in bags in other locations across the nation.

On the other hand, Grissom admitted Jennings could not have gained entry to the HOJ through the chained doors, and it is undisputed that Jennings did not threaten violence against anyone nor did Grissom know of Jennings previously using, or threatening to use, violence. Moreover, Porter and other deputies in the HOJ lobby notably chose to ignore and walk away from Jennings. Even though those deputies spoke to Jennings and were located nearer to Jennings than Grissom, Grissom chose to leave his office and walk into the vestibule, passing those deputies, in order to confront Jennings himself. It is undisputed that Grissom deployed pepper spray onto Jennings almost immediately after going into the HOJ vestibule. The parties agree that Grissom never asked Jennings about the contents of the bag he was holding. And it is undisputed that Grissom took no steps to seize or inspect the bag, secure medical care for Jennings, or arrest him after deploying the pepper spray.

The incident was captured on video which has been made part of the record in this case. The circuit court reviewed and described the video as follows:

> The video begins with Mr. Jennings standing outside the chained door of the HOJ talking through the gap about how[,] pursuant to an executive order of the Kentucky Supreme Court[,] the HOJ was supposed to be open to the public. [Jennings] is holding a black plastic bag and an article of clothing in his left hand. His right hand holds a cellular phone and is on the locked door adjacent to the chained door. Mr. Jennings asks into the whereabouts of Deputy Larry Priddy, with whom he had a prior incident. A sheriff's deputy, subsequently

-3-

identified as John Porter[,] approaches the chained door and pulls it closed[,] but it immediately returns ajar. Mr. Jennings makes racially insensitive remarks to Deputy Porter (both of whom are African American). And Deputy Porter leaves the vestibule. Mr. Jennings continues to shout through the gap at the chained door. As Deputy Porter leaves the vestibule, Major Grissom enters the vestibule. He takes four to four and a half steps towards the chained door, and[,] within six (6) seconds of entering the vestibule[,] he discharges OC Pepper Spray into the doorway gap[,] striking [Jennings]. In those six seconds, Major Grissom appears to make a hand gesture, but any dialog is not captured in the video. From the beginning of the video until the time [Jennings] is hit with the OC Pepper Spray, his hands and belongings remain as first described. In his left, a black plastic bag and an article of clothing, in his right a cellular phone, which remains on the locked door.

Opinion and Order, 6/05/2024, pg. 2-3.

Jennings sued Grissom, in his individual and official capacities; JCSO Sheriff Aubrey, in his individual and official capacities; and the JCSO (collectively referred to as Appellants). In his Amended Complaint, Jennings alleged Grissom's actions against him constituted criminal assault, civil battery, and intentional infliction of emotional distress.[1, 2] Jennings further alleged Grissom's actions were "wanton, malicious, intentional" and "purposefully undertaken for the purpose of

---

[1] Amended Complaint at 6.

[2] In the June 5, 2024 Opinion and Order of the Jefferson Circuit Court, the circuit court granted Appellants summary judgment on Jennings claim for damages from the intentional infliction of emotional distress. Jennings has not filed a cross-appeal, therefore, any issues relating to the intentional infliction of emotional distress claim or its dismissal are not before this Court and will not be addressed.

injuring Mr. Jennings."[3]  As to Sheriff Aubrey and the JCSO, Jennings alleged that they were "negligent in their retention of Grissom" whom Jennings alleged has a past history of violence and misconduct.[4]  Jennings further complained that Sheriff Aubrey and the JCSO "failed to adequately and properly train [and supervise] Grissom" and ensure proper policies and practices were put into place to prevent conduct such as that engaged in by Grissom against Jennings.[5]  Finally, Jennings alleged Sheriff Aubrey and the JCSO violated the Open Records Act, but that claim is now moot.[6]

Immunity, if applicable, is intended to shield governmental actors and agencies not just from liability for damages, but from "the burdens of defending the action." *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 474 (Ky. 2006).  Therefore, an immunity defense may be raised before discovery is complete so long as the trial court is presented with sufficient evidence to "reasonably make the determination" of immunity.  *Barnette v. Evans*, 697 S.W. 3d 749, 756 (Ky. App. 2024) (citations omitted).  Immunity is a question of law for the trial court, not a question of fact

---

[3] Amended Complaint at 7.

[4] Amended Complaint at 5, 7.

[5] Amended Complaint at 8, 9.

[6] The claim against Appellants for Violation of the Open Records Act was resolved long before Appellants sought immunity in their February 20, 2024 Motion and that issue is now moot and is not before this Court.

for a jury. *Sloas*, 201 S.W.3d at 475. Nevertheless, though presented as a matter of summary judgment, to answer the question of whether immunity applies, the trial court must undertake some level of fact-finding outside the normal parameters of the Kentucky Rules of Civil Procedure (CR). *See Sloas*, 201 S.W.3d at 475 (emphasis added) ("[O]nce the material facts *are resolved*, whether a particular defendant is protected by official immunity is a question of law[.] "). Thus, only *after* the question of immunity has been decided and denied would the trial court apply the "genuine issue of material fact" standard set forth in CR 56.03 to determine whether a moving party is entitled to summary judgment on the underlying claims.

Appellants sought the shield of immunity by filing a Motion for Summary Judgment on February 20, 2024. However, in that motion Appellants also alleged "[Jennings] has presented no affirmative evidence of a genuine issue of material fact on any of his claims."

From the Opinion and Order of the circuit court, we know discovery in this case included at least the depositions of Grissom and Jennings; the policies and procedures of the JCSO relating to use of force, including the use of pepper spray; and the video of the incident taken by a third party and provided by Jennings: all of which the circuit court reviewed prior to ruling on Appellants' motion.

The circuit court granted summary judgment to Sheriff Aubrey and Grissom on the official capacity claims against them. The circuit court made no ruling or analysis on Sheriff Aubrey's request for qualified official immunity in his individual capacity but denied immunity to Grissom on the claims against him in his individual capacity. In denying Grissom immunity, the circuit court found that Grissom's use of force was discretionary under the policies and procedures of the JCSO, and that Grissom acted in bad faith against Jennings. In addition, the circuit court concluded that there were "myriad" questions of fact for the jury in order to determine whether Grissom's actions were justified. Finally, the circuit court ruled that the "JCSO's 'cloak' of sovereign immunity has been legislatively waived [by KRS[7] 70.040] for the acts of its deputies. . . ." Thus, because the circuit court had denied Grissom immunity and summary judgment, the circuit court denied the JCSO's claim of immunity as well.

Appellants jointly filed this appeal. Appellants also note that the trial court failed to rule on Sheriff Aubrey's entitlement to qualified official immunity for all claims made against him in his individual capacity and ask this Court to correct that error of omission by granting Sheriff Aubrey qualified official immunity.

---

[7] Kentucky Revised Statutes.

DEFICIENT BRIEFS

Before we begin our analysis, both Appellants and Jennings urge us to impose sanctions on the other for failing to comply with the Kentucky Rules of Appellate Procedure (RAP). We agree that the briefs submitted by both parties are deficient. Most obviously, Appellants submitted a thirty-one-page brief that does not contain an appropriate word count certificate. RAP 31(G)(2)(a) provides that an appellant's opening brief "*shall not* exceed 8,750 words or 20 pages if computer generated . . . ." (emphasis added). A brief longer than 20 pages must contain a word count certificate, RAP 31(G)(1), which under RAP 15(C) must confirm "that the brief falls within the relevant word limit. The certificate must also state the number of words in the portion of the brief subject to the word limit." Appellants' opening brief is obviously computer-generated, but the purported word count certificate does not contain an actual word count; instead, the brief only states, (incorrectly), that it "is in conformity with the Kentucky Rules of Appellate Procedure Rule 15."

Also, as Jennings accurately notes, Appellants' brief does not "contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner." RAP 32(A)(4). Rather than attempting to rectify that deficiency, Appellants' reply brief insists they satisfied that requirement by citing portions of the circuit court's

order with which they disagree.  Appellants are incorrect.  Merely citing to a trial court's decision does not show with specificity where, or how, a party raised and preserved the issues contained in its appellate brief.

Finally, Appellants chose to repeatedly cite to this Court's opinion in *Volentine v. Sheehy*, No. 2022-CA-0336-MR, 2023 WL 2052301 (Ky. App. Feb. 17, 2023).  There are numerous problems with Appellants' reliance upon that opinion.  First, it was not designated for publication.  Unpublished opinions "are not binding precedent." *Hardin v. Jefferson Cnty. Bd. Of Educ.*, 673 S.W.3d 437, 443 (Ky. App. 2023) (citing RAP 40(D)(1)).  Citation to unpublished opinions is thus "disfavored" under RAP 41(A).  Second, an opinion of the Court of Appeals cannot become final during the pendency of a motion for discretionary review.  *See* RAP 40(G)(2).  A motion for discretionary review of this Court's opinion in *Volentine* was filed in March 2023, roughly nine months *before* Appellants submitted their opening brief.  Thus, Appellants have repeatedly cited to a nonfinal, unpublished opinion for which discretionary review had been granted. *See* RAP 40(H) (prohibiting citation to a nonfinal opinion).  Appellants note the grant of discretionary review in a footnote but do not further note that the granting of discretionary review meant this Court's opinion would automatically be superseded by the then-forthcoming decision of our Supreme Court.  *See* RAP 40(G)(2) (providing that if a motion for discretionary review is granted "the

-9-

opinion of the court finally disposing of the matter supersedes all lower court opinions arising from the appeal.").

Unfortunately for Appellants, soon after they submitted their opening brief, our Supreme Court rendered *Sheehy v. Volentine*, 706 S.W.3d 229 (Ky. 2024), which reversed the Court of Appeals' *Volentine* decision upon which Appellants relied. Appellants submitted their reply brief several months after the issuance of the Supreme Court's decision in *Sheehy*, but failed to mention the Supreme Court's decision in *Sheehy*, even though that decision unanimously reversed this Court's decision in *Volentine*, upon which Appellants relied in their opening brief.

Turning to Jennings' brief, his statement of points and authorities bizarrely refers to persons and trial court rulings that seem to be from a separate case unrelated to this action. Appellants also accurately note that the "Statement of the Case" section of Jennings' brief does not contain ample citations to the trial court record, as required by RAP 32(B)(3). Appellants also assert Jennings' word count certificate is inaccurate.

We should sanction both parties for submitting briefs which substantially fail to comply with RAP. Instead, however, we have reluctantly and leniently decided to overlook the deficiencies. *See Mullins v. Appalachian Reg'l Healthcare, Inc.*, 707 S.W.3d 1, 6 (Ky. App. 2025) (listing some of an appellate

-10-

court's options when a party submits a noncompliant brief, including ignoring the deficiencies). But we emphatically stress that we typically will impose sanctions when a party does not substantially comply with RAP, and only have refrained from doing so here because of the need to clarify the required findings a trial court must make when ruling on both qualified official immunity and summary judgment, and because both sides have submitted noncompliant briefs. *See J.P.T. v. Cabinet for Health and Fam. Servs.*, 689 S.W.3d 149, 153 (Ky. App. 2024); RAP 10(B) (listing potential sanctions for a failure to substantially comply with RAP, such as striking briefs, imposing fines, or dismissing an appeal).

STANDARD OF REVIEW

"[A]n order *denying* a substantial claim of absolute immunity is immediately appealable even in the absence of a final judgment." *Breathitt Cnty. Bd. of Educ. v. Prater*, 292 S.W.3d 883, 887 (Ky. 2009)). Accordingly, we have jurisdiction to review denial of immunity despite the interlocutory nature of the circuit court's order. *Id.* As part of the order under review, the circuit court also addressed substantive aspects of Appellee's claims and further granted immunity with respect to the official capacity claims. However, the scope of our appellate review must be confined to the circuit court's denial of immunity "and nothing more." *Cabinet for Health and Family Services, Department for Medicaid Services v. Sexton, by and through Appalachian Regional Healthcare, Inc.*, 566

-11-

S.W.3d 185, 190 (Ky. 2018) (quoting *Baker v. Fields*, 543 S.W.3d 575, 578 (Ky. 2018)). Any issues beyond the denial of immunity are not yet ripe for our review, and "our jurisdiction at this stage of the proceedings is strictly limited to the issue of governmental immunity." *University of Kentucky v. Regard*, 670 S.W.3d 903, 908 (Ky. 2023). Therefore, "we express no opinion whatsoever on the merits of the underlying claim." *Id*.

While the question of immunity is a question of law which the appellate court will review *de novo*, answering the question of immunity requires the trial court to make certain limited findings of fact which are "subject only to the clear error review of the appellate courts under CR 52.01." *Sheehy*, 706 S.W.3d at 236, 239 (footnote omitted). "Unless a factual conclusion is clearly erroneous, neither the Court of Appeals nor [the Supreme Court] has authority to set those conclusions aside." *Id.* at 244.

In this case, Appellants not only asked for summary judgment on the basis of immunity, but also sought summary judgment on the underlying claims alleging Jennings failed to raise any genuine issues of material fact. "An issue of material fact is 'genuine' at the summary judgment phase when discovery has revealed facts which make it possible for the non-moving party to prevail at trial." *Morales v. City of Georgetown*, 709 S.W.3d 146, 153 (Ky. 2024) (citations omitted). "The record must be viewed in a light most favorable to the party

opposing the motion for summary judgment and all doubts are to be resolved in his

favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky.

1991). "Because summary judgment does not require findings of fact but only an

examination of the record to determine whether material issues of fact exist, [the

appellate courts] generally review the grant of summary judgment without

deference to either the trial court's assessment of the record or its legal

conclusions." *Morales*, 709 S.W.3d at 153 (citations omitted).

ANALYSIS

I.    The Trial Court is Required to Make Certain Findings of Fact to
      Determine Whether a Government Employee is Shielded Under the
      Doctrine of Qualified Immunity. Only After the Trial Court has
      Determined Immunity Does Not Apply Does the Trial Court Determine
      Whether there are Genuine Issues of Material Fact to be Tried by a Jury.

"[T]he difficulty for all judges with qualified immunity has not been

articulation of the rule, but rather the application of it." *Flatford v. City of*

*Monroe*, 17 F.3d 162, 166 (6th Cir. 1994). Compounding this "arduous task,"

both the rule and its application have undergone much analysis in recent

history. *Morales*, 709 S.W.3d at 154. Rooted in both common law and the

constitutional doctrine of separation of powers, historically the rule has been

that "a state agency is entitled to immunity from tort liability to the extent that it

is performing a governmental, as opposed to a proprietary, function." *Sheehy*,

706 S.W.3d at 236 (quoting *Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky. 2001)).

However, the General Assembly, via KRS 70.040, waived the sovereign immunity traditionally enjoyed by the office of sheriff, imposing liability on the office for acts committed by the sheriff's deputies. *Sheehy*, 706 S.W. 3d at 236 (citing *Jones v. Cross*, 260 S.W.3d 343, 346 (Ky. 2008)). And, "when sued in their individual capacities, public officers and employees enjoy only qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero*, 65 S.W.3d at 522.

"[W]hether an official is entitled to qualified immunity turns upon 'the actor's status as a governmental official; [and] the ministerial/discretionary distinction[.]" *Sheehy*, 706 S.W.3d at 236-37 (quoting *Meinhart v. Louisville Metro Gov't*, 627 S.W.3d 824, 830 (Ky. 2021)). "Ministerial actions are those that require 'only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.'" *Morales*, 709 S.W.3d at 155 (quoting *Yanero*, 65 S.W.3d at 522). "A discretionary action is one 'involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment.'" *Id*. at 154 (quoting *Yanero*, 65 S.W.3d at 522). If the act was discretionary, the trial court must then determine whether the action was taken

in good faith and within the scope of the officer's authority. *Sheehy*, 706 S.W.3d at 237.

Once a defendant moves for summary judgment on the basis of qualified governmental immunity, making this determination requires the trial court to make certain limited findings of fact based on evidence in the record. *Id.* at 239. First, in order to determine whether an act was ministerial or discretionary, the trial court must "review the relevant statute, regulation, rule, or policy[.]" *Id.* at 237. "Internal government rules, policies, and regulations necessarily constrain the individual discretion of public employees, and in some instances limit their discretion so greatly as to render their employment functions absolute, certain, and imperative[.]" *Morales*, 709 S.W.3d at 155 (internal quotation marks and citations omitted). If the trial court determines an act was ministerial, the court's factfinding role ends. Qualified official immunity is not afforded to a government employee who negligently performs a ministerial act, and "[w]hether the [officer's] actions . . . amount to a tort or not depends on whether he negligently failed to perform his mandatory acts, or negligently performed them, which is a question for a jury, assuming of course there is evidence [creating a material issue of fact] that he acted unreasonably, that is, negligently." *Sheehy,* 706 S.W.3d at 237 (quoting *Marson v. Thomason*, 438 S.W.3d 292, 301 (Ky. 2014)). On the other hand, if the trial court determines the officer's actions were "performed within the scope of

his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Sheehy*, 706 S.W. 3d at 237 (quoting *Yanero*, 65 S.W.3d at 523).

The circuit court extensively reviewed the Use of Force policies of the JCSO, citing and even highlighted in bold print portions of those policies.

> Deputies are sometimes confronted with situations where control must be exercised to **effect arrests and protect their life and/or the lives of others**. Control may be achieved through advise [sic], persuasion, warnings, or by the use of physical force. **While the use of reasonable physical force may be necessary in situations that cannot be otherwise controlled, force may not be resorted to unless other reasonable alternatives have been exhausted or would clearly be ineffective under the particular circumstances. Deputies are permitted to use that force necessary to protect themselves and others from bodily harm**. [§1.3] (emphasis added).
>
> Deadly force is defined as: "Any use of force that is likely to cause death or serious physical injury." [§1.3(1).]
>
> Non-deadly force is defined as: "Any use of force other than that which is considered deadly force." [§1.3(2).]
>
> Reasonable belief is defined as: "When facts or circumstances the deputy knows or should know, are such to cause an ordinary and prudent person to act or think in a similar way under similar circumstances." [§1.3(3).]
>
> The progression of force will encompass both deadly and non-deadly force. The force continuum used by the [JCSO] is based on the Pressure Point Control Technique

-16-

(PPCT) Management System.  One or all control techniques may be used depending upon the level of resistance offered by a suspect.  [§1.3(A)(1).]

**It is not necessary to follow the order of continuum when circumstances dictate that the deputy escalate to a higher level of control**.  Variables which may be included, but are not limited to:  the size and gender of the deputy and the suspect, the totality of the circumstances such as **the danger or imminent threat to the deputy or others**, and the deputy's reaction time or ability to respond.  [§1.3(A)(2)] (emphasis added).

When the use of force is necessary, deputies shall, to the extent possible, utilize an escalating scale of options.  The scale of options, in order of increasing severity, is as follows. a. Deputy Presence; b. Verbal Commands/Directives; c. Empty Hand Control; d. Less Lethal (OC Spray, Taser, Bean Bag Shotgun, & Baton); e. Firearms.  [§1.3(F)(1).]

Where deadly force is not authorized, deputies should access [sic] the incident in order to determine which non-deadly technique or weapon is best to bring the incident under control or affect an arrest in a safe manner.  **It is not, however, the intent of this directive to require that deputies must try each of the available options before escalating to the next available option.  The option uses [sic] should be based on the decision of the deputy involved in the incident.  It is only required that the degree of force utilized is reasonable**.  When analyzing the "reasonableness" deputies should consider: [the] severity of the suspected criminal activity; Does the suspect pose an **immediate threat** to deputies or others; Is the suspect actively resisting or attempting to evade arrest?  [§1.3(F)(2)] (emphasis added).

These options are available to deputies when there is **a high probability of violence** and they have determined that the use of deadly force is not yet justified. . . . (O.C.)

-17-

"PEPPER SPRAY"  **Deputies are authorized to use O.C. in circumstances where the deputy reasonably believes that a degree of force is necessary to overcome actual or probable resistance or assaults, in order to take a suspect into custody**.  [§1.3(F)(d)(1)] (emphasis added).

The use of physical force by a deputy . . . upon another person is justifiable when the deputy, acting under official authority, **is making or assisting in making an arrest**, and the deputy:  a. Believes that such force is necessary to effect [sic] the arrest. . . .  [§1.3(G)(1)] (emphasis added).

Physical force may be used as a means of:  a. Physical restraint or control; b. subduing a person resisting arrest; c. Defense of any person; or d. Moving, removing, or arresting, any person who is obstructing a lawful law enforcement action in such a manner that the enforcement action cannot be accomplished. [§1.3(G)(5).]

A deputy may use non-lethal force at any level necessary to:  1. Defend himself/herself or another person; 2. Subdue a person resisting arrest; or 3. Prevent escape from custody.  [§1.4(A).]

OC [sic] Spray may be used as a means of:  a. Physical restraint or control of a person who is **combative and presents a physical danger to the deputy or any other person**, or b. **Defense of any person**.  [§1.4(E)(4)] (emphasis added).

OC [sic] Spray will **not** be used for the following: a. As a **threat to make a person comply with a deputy's verbal order when no physical violence is imminent; . . . or to punish someone**.  [§1.4(E)(5)] (emphasis added).

> If feasible, the deputy should attempt to warn the subject of the intention to use O.C.  [§1.4(E)(6).]

Opinion and Order, June 5, 2024 at 7-8.  After enumerating the relevant policy sections, the circuit court determined that it was "unquestionable that Grissom possesses considerable discretion concerning his use of force under the JCSO's policies."[8]  We agree with the circuit court's assessment.

The circuit court was short on analysis, but this Court notes that the specific Use of Force policies quoted and emphasized in the June 5, 2024 Opinion and Order repeatedly state that an officer's actions must be *reasonable*; that the officer must possess a *reasonable belief* in circumstances which justify his or her actions; and that the officer's actions are not required to follow a particular "continuum" of progression in the escalation of force.[9]  In addition, the specific policies of the JSCO discussing the use of pepper spray which also made extensive use of words like "reasonable" and "reasonably believes," and phrases like "may be used."[10]  This permissive language that provides guidance rather than explicit instructions gives ample support for the circuit court's conclusion that Grissom's

---

[8] Opinion and Order, June 5, 2024 at 8.

[9] Opinion and Order, June 5, 2024 at 7-8.

[10] Opinion and Order, June 5, 2024 at 8.

actions were discretionary and that he was acting within the bounds of his authority.

As specific examples, the circuit court quoted and emphasized §1.3 and §1.3(F)(2) of the JCSO's policies which state that "[d]eputies are permitted to use that force necessary to protect themselves or others from bodily harm," and that the determination of what "non-deadly technique or weapon" to use in a situation is the "decision of the deputy involved in the incident."[11] As is plain from the language of the policy, there is no fixed, one-size-fits-all, rigid formula for determining whether a JCSO law enforcement officer may use force to protect himself or herself (or others) or, if using force is necessary, what force may be used. "There is considerable discretion inherent in law enforcement's response to an infinite array of situations implicating public safety on a daily basis." *Meinhart*, 627 S.W.3d at 835. *See also, e.g.*, *Energy & Environment Cabinet, Div. of Forestry, Commonwealth v. Robinson*, 363 S.W.3d 24, 29 (Ky. App. 2012) (holding that "when an actor must choose between or among various courses of action, and that choice involves the exercise of judgment and/or overriding policy issues, the act is discretionary.").

---

[11] Opinion and Order, June 5, 2024 at 7.

Appellants did not dispute that Grissom's actions were discretionary and within the scope of his authority. Thus, the burden shifted to Jennings to prove Grissom acted in bad faith.

"[Q]ualified official immunity yields to proof that a defendant's actions were malicious." *Martin v. O'Daniel*, 507 S.W.3d 1, 6 (Ky. 2016). "Acting with malice and acting in good faith are mutually exclusive." *Id*. at 5. This was reiterated recently in *Sheehy*: "Qualified official immunity cannot be applied in cases where a government official . . . lacks good faith in the exercise of a discretionary authority." *Sheehy*, 706 S.W.3d at 233. Therefore, there are further findings of fact related to good faith that must be made by the trial court to determine whether an officer is shielded under the doctrine of qualified immunity.

To show Grissom "acted in bad faith when making an on-the-spot judgment call," Jennings "must [have] demonstrate[d] the officer knew or reasonably should have known that the action he took within his sphere of official responsibility would violate [Jennings'] rights or that the officer took the action with the malicious intention to cause a deprivation of constitutional rights or other injury[.]" *Meinhart*, 627 S.W.3d at 835 (internal quotation marks and citations omitted). Bad faith may also exist when the public official's acts demonstrate "a corrupt motive" or are "objective[ly] unreasonable[.]" *Yanero*, 65 S.W.3d at 523. "[I]n most cases, 'good faith' is just a presumption that exists absent evidence of

'bad faith.'" *Sloas*, 201 S.W.3d at 475. Therefore, though the issue of qualified immunity is presented to the trial court as a question of summary judgment, it is not enough for the trial court to find that genuine issues of material fact exist surrounding the question of good faith, it is the role of the trial court to make those findings of fact.

It is here the circuit court seems to have become confused. The circuit court explicitly stated "the [c]ourt believes [Jennings], and the video recording of the subject incident, provides [sic] direct or circumstantial evidence that the discretionary act was not performed in good faith."[12] This is a conclusion, but the circuit court did not set forth any findings of fact to support that conclusion. Instead, the trial court skipped to the standard summary judgment analysis of the underlying claims:

> The video of the subject incident creates myriad issues of genuine fact as to whether use of force was justified under the JCSO's policies, and not simply Grissom's discretionary authority thereunder. Examples include, but are not limited to: Whether force was necessary to protect sheriff's deputies or others from bodily harm [§ 1.3]; whether there was a danger or imminent threat to the deputies or others [§ 1.3 (A)(2)]; whether there was an immediate threat to deputies or others [§ 1.3 (F)(2)]; whether there was a high probability of violence, or actual or probable resistance or assaults [§ 1.3 (F)(d)(1)]; whether there was any obstruction of a lawful law enforcement action [§ 1.3 (G)(5)]; whether [Jennings] presented a physical danger to deputies or any other

---

[12] Opinion and Order, June 5, 2024 at 10.

person [§ 1.4 (E)(4)]; and/or whether the O.C. pepper spray was used against [Jennings] simply to make him comply with a deputy's verbal order when no physical violence was imminent or to punish him [§ 1.4 (E)(5)].

Opinion and Order, June 5, 2024 at 10-11. While justification is a defense to the civil tort of battery, it is also relevant to a determination of good faith. *See Lexington-Fayette Urban County Government v. Middleton*, 555 S.W.2d 613, 617 (Ky. App. 1977) (In an action for false arrest, assault and battery, "the burden of proof is always on the plaintiff. However, once the plaintiff meets his burden and establishes his case, if the defendant attempts justification of his conduct, then the burden does shift to him to establish both that he had reasonable grounds [for making the arrest] and in good faith did believe those grounds for making the arrest and that he used no more force than necessary.").

Because the jury must also answer the question of good faith, does not relieve the trial court from answering that question. Qualified immunity is determined by the trial court, not the jury. Where qualified immunity is sought for a discretionary act, immunity is dependent upon the officer's good faith. Therefore, these "myriad issues of genuine fact" are questions for the circuit court to answer and not just the jury.

The circuit court did make several findings of fact. The court thoroughly reviewed and described the video of the incident. These are findings of fact. And in a footnote to the Opinion and Order, the circuit court noted: "The

video recording provided by [Jennings] does not clearly reflect Sgt. Porter verbally commanding [Jennings] to leave the HOJ door, as reported by [Appellants]. It also appears to refute Grissom's claim that he led [sic] the can of O.C. Spray right in front of [Jennings] and told him to leave 'multiple times' before he sprayed it."[13] These are findings of fact that the circuit court tried to couch in neutral terms ("does not clearly reflect" and "appears to refute") to seemingly avoid making findings of fact.

This Court understands that *Sheehy* is a new opinion of the Supreme Court that was unavailable to the circuit court when it rendered its decision. Furthermore, this Court realizes it may be uncomfortable for a trial court to answer the question of good faith as it relates to qualified immunity knowing a jury may later be presented the same question of good faith when analyzing the underlying civil claim. However, this is what the trial court is called upon to do, and the court cannot shy away from its duty. *See Martin*, 507 S.W.3d at 5 (citations omitted) (In a case for malicious prosecution: "Malice is a material fact that a plaintiff must prove to sustain a malicious prosecution claim. But, it is also a fact that defeats the defendant's assertion of qualified official immunity. . . . It thus becomes apparent that the very same evidence that establishes the eponymous element of a malicious prosecution action simultaneously negates the defense of official immunity.").

---

[13] Opinion and Order, June 5, 2024 at 11 n.8.

Therefore, for failure to provide specific findings of fact from the record to support the conclusion that Grissom acted in bad faith, we vacate the circuit court's denial of Grissom's claim for qualified official immunity and remand with the above instructions. Because a trial court cannot determine whether there are material issues of fact for a jury until the question of immunity has been resolved, we also vacate the circuit court's decision that there are genuine issues of material fact as to whether Grissom was justified in his use of force, and remand for the circuit court to first make the proper findings of fact and determination of the application of immunity. If, after making the required findings of fact, the court again determines Grissom is not entitled to immunity, then the court can properly address whether there are genuine issues of material fact to be addressed by a jury pursuant to CR 56.

II.     The Trial Court as the Finder of Facts Relating to the Application of Qualified Official Immunity is Entitled to Determine the Weight and Credibility of the Evidence.

This Court's decision to vacate the order denying Grissom summary judgment is based solely on the failure of the circuit court to provide findings of fact to support the conclusion that Grissom is not entitled to qualified official immunity because he acted in bad faith. However, this was not the basis of Appellants' appeal. Appellants claim the circuit erred by relying upon the wrong

-25-

evidence in reaching its decision. As we are remanding for the circuit court to make findings of fact, it is important to address Appellants' evidentiary arguments.

First, Appellants argue the circuit court erred by "substituting its own perceptions over Grissom's real-time perceptions."[14] Much confusion has resulted from the language used by the Kentucky Supreme Court in *Meinhart* that "it is not in the public's interest to allow a jury of laymen with the benefit of 20/20 hindsight to second-guess the exercise of a police officer's discretionary professional duty." *Meinhart*, 627 S.W.3d at 835. This was often used to argue, as Appellants do here, that the courts also should not second-guess the officer's "real-time perception" of the events and the justification for his or her actions. Fortunately, the Kentucky Supreme Court used *Sheehy* to set the record straight:

> To say that a jury ought not question the discretionary acts of police officers does not mean no one ought to question them. The very fact that our law requires a good faith element to discretionary acts prior to granting qualified immunity implies that *someone* will review those actions if they are the subject of a lawsuit. If it is not a jury question, then it is manifestly one for the trial court. And if this review is to be meaningful, to be something more than a rubber-stamp, then it must be that an officer's assertions must have a reasonable basis in fact.

*Sheehy*, 706 S.W.3d at 241. Therefore, it is up to the finder of fact, in this case the trial court, to weigh the evidence and judge the credibility of the witnesses.

---

[14] Appellants' Brief at 25.

Appellants also argue that the circuit court misinterpreted another holding of *Meinhart* and erred by considering the JCSO policies when evaluating the question of good faith. More particularly, Appellants state: "The JCSO policies are not dispositive of good faith. JCSO policies were probative of whether Grissom's acts were discretionary and made within the scope of his authority, not good faith."[15] We disagree. *Meinhart* stated: "Compliance with the rule, policy, or regulation simply is not relevant in that calculus [of whether the public employee's act was discretionary or ministerial]. Rather compliance *is relevant to negligence and the issue of whether the act was undertaken in good faith*." *Meinhart*, 627 S.W.3d at 830 (emphasis added). Therefore, the circuit court did not err in considering the JCSO policies in relation to whether Grissom's use of force against Jennings was justified.

Finally, Appellants argue that it was "improper [for the trial court] to solely rely on [the video of the incident] when holding Jennings to his burden to prove the absence of bad faith."[16] In *Sheehy*, the Kentucky Supreme Court also clarified the weight the trial court should give to video evidence of an incident. First, this Court notes that the circuit court's Opinion and Order indicates that the court did not *solely* rely upon the video provided by Jennings. The circuit court

---

[15] Appellants' Brief at 23.

[16] Appellants' Brief at 23.

-27-

reviewed the testimony of Jennings and Grissom, and the Use of Force policies of the JCSO, as well as the video. Second, as here, the *Sheehy* appellants also argued that the trial court "impermissibly relied on its review of . . . video footage in hindsight[,] and should have only considered whether [the officer] had articulated reasonable" justification for his actions. *Sheehy*, 706 S.W.3d at 239. The Kentucky Supreme Court was not persuaded by their argument and declared:

> As a simple matter of time and physics, all courts in almost every case review evidence "in hindsight." If any evidence below is "in hindsight" then it is [the officer's] recounting a past event from his own memory. The video footage at least has the virtue of recording events in real time that are subsequently capable of being reviewed for what it shows free from the vagaries of human memory and human bias. The video footage recorded the same events that [the officer] recounted thus, both were "real time perception" of the event in question. We acknowledge that the eyesight of police officers and the perspective of a video camera can be different; and in acknowledging that truth, police officers may react to something off-camera that governs their actions. In such instances the testimony of the officer himself may be the most credible or the only evidence. That is not the case, however, in all circumstances. It can be just as true that an officer's perception and the camera's perspective encompass the same area. In such instances, when a discrepancy exists between the video and the inperson testimony, an issue of weight and credibility is presented for the factfinder, subject only to the clear error review of appellate courts[.] . . . [T]he trial court is acting as the factfinder. . . and is empowered to make the determination that the video "speaks for itself" as a matter of substantive evidence or that the video is in fact inconsistent with [the officer's] testimony, if viewed as demonstrative evidence. . . .

> When the video evidence and the officer's testimony
> both regard the same events and are contradictory, the
> trial court – again in its capacity as factfinder – is
> empowered to note the inconsistency, weigh the
> evidence, and make credibility determinations.

*Id*. at 239-40 (citations omitted). Therefore, the trial court may give the video and the testimony of the witnesses the weight the trial court believes they deserve with neither being automatically assessed as outweighing the other.

However, this again notes the importance of detailed findings of fact and analysis of the evidence by the trial court. Findings which were lacking here. Findings which "need not be extensive, but they should be complete enough to enable adequate appellate review." *Barnette*, 697 S.W. 3d at 757 (internal quotation marks and citations omitted).

III.    We Decline to Address Claims Against Sheriff Aubrey in his Individual Capacity.

Appellants clearly asked for summary judgment on the individual capacity claims against Sheriff Aubrey. *See* Record (R.) at 470-75. However, Appellants admit in the introduction section of their brief that the circuit court "ignored" the arguments in their motion for summary judgment that Sheriff Aubrey enjoyed qualified official immunity for the individual capacity claims against him. Appellants did not ask the circuit court to amend its decision to address those claims. *See, e.g.*, CR 52.02 (motion to amend a judgment); CR 59.05

(motion to alter, amend, or vacate a judgment). Nonetheless, Appellants ask us to hold that Sheriff Aubrey is entitled to immunity for the individual capacity claims against him. We decline to do so.

The authorities cited by Appellants which purportedly allow us to address matters which the trial court did not are materially distinguishable. For example, Appellants cite precedent allowing an appellate court to affirm a trial court on alternate grounds. Of course, we may affirm the trial court "for any reason supported by the record." *McCloud v. Commonwealth*, 286 S.W.3d 780, 786 n.19 (Ky. 2009). But here there is no decision to affirm, on alternate grounds or otherwise, determining the viability of the individual capacity claims against Sheriff Aubrey.

Issues involving qualified official immunity require "certain factual findings" to be made. *Meinhart*, 627 S.W.3d at 829. But "it is axiomatic that appellate courts are not fact-finders[.]" *Calhoun v. CSX Transp., Inc.*, 331 S.W.3d 236, 245 (Ky. 2011). We decline to make factual findings and use those findings to assess whether Sheriff Aubrey is entitled to qualified official immunity for the individual capacity claims. "As an appellate court, we review judgments; we do not make them." *Klein v. Flanery*, 439 S.W.3d 107, 122 (Ky. 2014).

IV. **The JCSO Lacks Immunity for the Tortious Acts or Omissions of Grissom.**

Jennings asserted claims against the JCSO in Counts II and III of his complaint, such as a claim for failing to properly train Grissom. The circuit court seemed to grant summary judgment to the JCSO on the claims in Count II but did not rule on whether the JCSO was entitled to summary judgment on the claims in Count III.

First, the circuit court held that the claims against Sheriff Aubrey in Count II, which included claims such as supervisory liability and failure to train Grissom, fell "within Sheriff Aburey's *official actions*. These are not claims alleging vicarious/*respondeat superior* liability against the JCSO for the tortious acts of Grissom, to which KRS 70.040 has waived sovereign immunity" so "all official capacity claims against Sheriff Aubrey (and the claims against Grissom in is [sic] official capacity) are barred by absolute official immunity."[17] Thus, as we construe it, the circuit court granted summary judgment to Appellants on all claims in Count II of Jennings' complaint, including those against the Sheriff's Office. As only a denial of immunity is able to be reviewed at this stage of the proceedings, we decline to address further the grant of summary judgment to the JCSO for the claims in Count II.

---

[17] Opinion and Order of June 5, 2024 at 6 (emphasis original).

However, the circuit court did not address whether the JCSO was entitled to immunity or summary judgment on the claims against it in Count III. Instead, the circuit court merely stated in a footnote that "Count III also alleges municipal/organizational liability theories' against Sheriff Aubrey and the JCSO for an alleged continuing policy, pattern, custom and/or practice of willfully and deliberately ignoring the rights of citizens, and failure to adequately train and supervise Grissom."[18]  The court did not further address those Count III claims on the merits.

Consequently, for the same reasons we discussed when we declined to address on the merits the individual capacity claims against Sheriff Aubrey, we shall not address on the merits whether the JCSO is entitled to summary judgment on the claims against it in Count III of Jennings' complaint (such as the alleged failure to adequately train Grissom and the alleged existence of a policy of deliberately ignoring the rights of others).  Instead, we view the scope of what is properly before us regarding the JCSO as only encompassing whether the JCSO may be held liable for the allegedly tortious acts of Grissom.  Indeed, we perceive that to be the only argument regarding the claims against the JCSO discussed in Appellants' brief.  The entirety of Appellants' one-paragraph argument about the

---

[18] Opinion and Order of June 5, 2024 at 6 (internal quotation marks omitted).

liability of the JCSO is that there can be no liability because Grissom is entitled to qualified official immunity on all claims against him.

KRS 70.040 provides that "[t]he sheriff shall be liable for the acts or omissions of his deputies; except that, the office of sheriff, and not the individual holder thereof, shall be liable under this section." Our Supreme Court held "the plain language of KRS 70.040 leaves no room for any other reasonable construction than a waiver of the sheriff's official immunity (the office of sheriff) for the tortious acts or omissions of his deputies." *Jones*, 260 S.W.3d at 346. And *Sheehy* confirms this: "Finally, because we conclude that qualified immunity does not apply to [Deputy] Volentine's actions, KRS 70.040 operates as a waiver of the [Hardin County Sheriff's Office's] governmental immunity." *Sheehy*, 706 S.W.3d at 244 (quoting *Jones*, 260 S.W.3d at 346).

We have already vacated and remanded the circuit court's decision denying immunity and summary judgment to Grissom regarding the individual capacity claims. Thus, as the immunity of the JCSO for the acts committed by Grissom is dependent upon the immunity of Grissom, we also vacate and remand the circuit court's decision denying immunity and summary judgment to the JCSO.

CONCLUSION

We view any remaining contentions of error in the parties' briefs as moot, unpersuasive, or unpreserved. *See, e.g.*, *Schell v. Young*, 640 S.W.3d 24, 29 n.1 (Ky. App. 2021).

In summary, for the foregoing reasons, we VACATE the portion of June 5, 2024 Opinion and Order of the Jefferson Circuit Court which denied qualified official immunity and summary judgment to Grissom and the JCSO for the claims against Grissom in his individual capacity and REMAND for the circuit court to make required findings of fact. We AFFIRM the remainder of the Order.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Carol S. Petitt
Mathew R. Bastin
Pewee Valley, Kentucky

BRIEF FOR APPELLEE:

David B. Mour
Louisville, Kentucky